**Roberta DELANEY; Gayle Hartmann, et al., Petitioners,**

v.

**ENVIRONMENTAL PROTECTION AGENCY, Respondent.**

No. 88–7368.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 26, 1989.

Decided March 1, 1990.

As Amended April 11, 1990.

David S. Baron, Arizona Center for Law in the Public Interest, Tucson, Ariz., for petitioners.

Alan W. Eckert, Associate General Counsel, U.S. Environmental Protection Agency, Washington, D.C., for respondent.

Before TANG, REINHARDT and WIGGINS, Circuit Judges.

WIGGINS, Circuit Judge:

Residents of Maricopa and Pima counties, Arizona, petition this court to vacate as arbitrary and capricious the Environmental Protection Agency's approvals of the counties' Clean Air Act implementation plans. We have jurisdiction under 42 U.S.C. § 7607(b)(1) (1982). We vacate the EPA's approvals of the plans, and direct the EPA to take further action consistent with this opinion.

## BACKGROUND

The Clean Air Act, as amended in 1970, mandated that states as expeditiously as practicable, but not later than December 31, 1975, reduce the levels of certain ambient pollutants to comply with the National Ambient Air Quality Standards set by the EPA. 42 U.S.C. § 7409(a), (b) (1982). Preliminarily, each state had to develop a state implementation plan to achieve this goal. 42 U.S.C. § 7410(a) (1982).

After many areas of the country failed to attain some or all of the national ambient air quality standards on time, Congress amended the Act in 1977, providing new deadlines for nonattainment areas. 42 U.S.C. §§ 7501–7508 (1982). The 1977 amendments required states to submit by January 1, 1979, for each of their nonattainment areas, a revised implementation plan that provided for implementation of all reasonably available control measures to attain the relevant national ambient air quality standards as expeditiously as practicable, but not later than December 31, 1982. 42 U.S.C. § 7502. If a state did not submit an adequate revised state implementation plan by the 1979 deadline, the EPA had to promulgate its own federal implementation plan. 42 U.S.C. §§ 7410(c)(1), 7502(b)(1). The 1977 amendments provided only one exception: If a state demonstrated in its revised implementation plan that the carbon monoxide or ozone ambient air quality standard could not be attained by the close of 1982 despite implementation of all reasonably available control measures, the state could have until the end of 1987 to attain the relevant air quality standard in that nonattainment area. 42 U.S.C. § 7502(a)(2). In that case, the state had to submit a second revised implementation plan to the EPA by July 1, 1982. 42 U.S.C. § 7502(c).

In 1978, the EPA designated large areas of both Maricopa and Pima counties as nonattainment areas for carbon monoxide. In 1979, Arizona submitted revised implementation plans for both areas. In 1983, the EPA approved the plans subject to certain conditions. Neither area, however, satisfied the EPA's conditions or attained the carbon monoxide standard by the 1982 deadline. Arizona failed in its attempt to extend both areas' attainment deadlines to 1987, but submitted additional revised plans for the areas to attain by the 1987 deadline anyway. The EPA rejected these additional revised plans and we upheld that decision. *Arizona v. Thomas,* 824 F.2d 745 (9th Cir.1987), *later proceeding* 829 F.2d 834 (9th Cir.1987).

When Arizona thereafter failed to submit adequate plans for Maricopa and Pima counties, petitioners filed suit in the Arizona district court. That court ordered the EPA to promulgate implementation plans for both counties by March 30, 1988 (later extended to August 10, 1988), unless before this date Arizona submitted, and the EPA approved, adequate state plans. *McCarthy v. Thomas,* No. 85–344 (D.Ariz. August 10, 1987). Arizona submitted, and the EPA ultimately approved (with revisions), state implementation plans for both counties on August 10, 1988. Petitioners now challenge these approvals.

## DISCUSSION

We will not set aside the EPA's approval of a state implementation plan unless it is arbitrary, capricious, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A); *Arizona v. Thomas,* 824 F.2d at 748. We will not set aside an agency's construction of a statute it is implementing unless that construction conflicts with clear congressional intent or is unreasonable. *Chevron USA, Inc. v. Natural Resources Defense Counsel, Inc.,* 467 U.S. 837, 842–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984).

I. *The EPA's Decision That Delinquent Nonattainment Areas May Take Three Years From Approval of Their State Implementation Plan to Attain the National Ambient Air Quality Standards*

Because the Clean Air Act amendments of 1977 made the 1982 compliance deadline absolute (with the one exception noted above), the amendments did not specify an additional deadline for nonattainment areas that failed to obtain revised implementation plan approval and national ambient air quality standard compliance by the 1982 deadline. In this circumstance, the EPA adopted the policy that it should evaluate the adequacy of the Maricopa and Pima county plans based on whether they provide for attainment by three years from the date it approved those plans, August 10, 1991. Petitioners contend that the EPA's policy is arbitrary and capricious. Now that the 1977 amendments' deadline

for compliance has passed, petitioners assert, Pima and Maricopa Counties must attain the carbon monoxide ambient air quality standard as soon as possible utilizing every available control measure.

The EPA contends that Congress expressed no clear intent on the attainment deadline that the EPA should apply in evaluating the Maricopa and Pima county plans because the 1977 amendments did not specify a deadline for nonattainment areas that failed to obtain revised state implementation plan approval and national ambient air quality standard compliance by the 1982 deadline. The EPA argues that this amounts to a "statutory gap." As a result, the EPA believes, we must uphold its policy of allowing compliance within three years of state implementation plan approval because it is a reasonable construction of the 1977 amendments.

The EPA argues that if Congress had considered that some nonattainment areas would not meet the deadline specified in the 1977 Amendments, Congress would have intended that the EPA administratively establish a new three year attainment period from the date of implementation plan approval deadline, like those provided in the Clean Air Act amendments of 1970. The EPA contends that this result is consistent with the language, history, and overall purposes of the Act. The EPA contends that Congress knew some states would not attain by the 1982 deadline and did not intend that states implement draconian measures.

The EPA explains the seemingly absolute nature of the 1977 amendments' 1982 deadline by stating that some legislators felt the need to keep fixed deadlines, even as "somewhat of a legal myth," because they "provide a basis for obtaining maximum progress towards clean air." Transcript, Mark-up, Clean Air Act Amendments, at 13 (May 4, 1977) (Statement of Sen. Domenici), *reprinted in* State Implementation Plans for Nonattainment Areas for Ozone and Carbon Monoxide: General Preamble and Notice of Future Actions, 52 Fed.Reg. 26,408 (July 14, 1987) [hereinafter "Preamble and Notice"]. If the deadlines turned out not to be realistic, there would be "plenty of time for legislative relief." 123 Cong.Rec. 18,038 (June 8, 1977) (Statement of Sen. Stafford), *reprinted in* Preamble and Notice, 52 Fed.Reg. 26,408 (July 14, 1987). The EPA contends that petitioners' position would require the draconian measures that Congress allegedly intended to avoid. The EPA argues that, in effect, it is just doing what Congress did in 1977 when, faced with many states' failure to meet attainment deadlines, Congress revised the Clean Air Act, extending those deadlines at least three years.

Although we recognize the EPA's predicament, we cannot accept the EPA's position. As the EPA itself recognizes, Congress explicitly declined to allow extensions of the deadline because it believed an absolute deadline to be necessary. Other circuits have characterized the 1982 deadline as the " 'heart' of the 1977 Amendments," *City of Seabrook v. EPA*, 659 F.2d 1349, 1357 (5th Cir.1981), *cert. denied*, 459 U.S. 822, 103 S.Ct. 51, 74 L.Ed.2d 57 (1982), implemented according to a precise schedule to avoid a repetition of the failure of many states to attain the national ambient air quality standards by the deadline specified in the 1970 amendments. *Connecticut Fund for the Environment v. EPA*, 672 F.2d 998, 1001–02 (2d Cir.), *cert. denied*, 459 U.S. 1035, 103 S.Ct. 445, 74 L.Ed.2d 601 (1982).

This court has already found the deadlines of the 1977 amendments to be "clear and unambiguous." *Abramowitz v. EPA*, 832 F.2d 1071, 1079 (9th Cir.1987). We stated:

Because we find the language of the Act clear and unambiguous, we do not believe that EPA has the discretion to ignore the statutory deadline. We are informed by counsel for both sides of their expectation that Congress will extend the deadline once again in the near future, but we must apply the law as it now stands, not as it may become.... Until the Clean Air Act is further considered ... the Agency must "give effect

to the unambiguously expressed intent of Congress."

*Id.* (citations omitted).

We, and the EPA, are bound by the statutory scheme until Congress alters that scheme. As the EPA states in one of its national guidance documents:

[T]he legislative history shows that Congress set up the Part D system in order to force communities and industry to do their utmost to bring about attainment as rapidly as possible and expected that a future Congress would change the course it had set, if necessary, to avoid any unacceptable consequences.

.   .   .   .   .

... Plainly, the original intention of the committee, which evolved ultimately into the current Part D system, was to generate [state implementation plans] that would provide for attainment by a specific date, even if they contained draconian measures, and to leave the task of making adjustments to a future Congress.

Preamble and Notice, 52 Fed.Reg. 26,407–08 (July 14, 1987).

When Congress has explicitly set an absolute deadline, congressional intent is clear. It is a semantic game to claim that once a state fails to meet an absolute deadline, a statutory gap is created because Congress has not provided a back-up deadline for its explicitly absolute deadline. If Congress had been more lenient and allowed a one-year fall back extension, the EPA would be bound by that directive. The EPA cannot extract leeway from a statute that Congress explicitly intended to be strict.

In any case, the EPA's national guidance documents state that for those areas that qualified for an extension from 1982 to 1987, if their control measures "are not adequate to demonstrate attainment by 1987, additional measures which can be implemented after 1987 must be identified and adopted and attainment must be demonstrated by the earliest possible date." Environmental Protection Agency Criteria for Approving 1982 Ozone and Carbon Monoxide Plan Revisions, 46 Fed.Reg. 7186 (January 22, 1981) [hereinafter "Criteria"]. "The 1982 [state implementation plan] revision ... must demonstrate that all possible measures will be implemented...." *Id.* at 7188 (listing four examples of additional control measures). We believe that it is unreasonable for the EPA to treat more leniently areas that did not qualify for the 1987 extension than areas that did qualify. We believe that the only reasonable interpretation of the 1977 amendments is that if the 1982 deadline that Congress specified is not met, the national ambient air quality standards must be attained as soon as possible with every available control measure, including those that the EPA identified in its criteria for approving 1982 plans.

II. *The EPA's Decision that the Maricopa and Pima Plans Provide for Sufficient Control Measures*

▆ The plans that the EPA approved for Maricopa and Pima Counties are similar. Both require that:

(1) gas stations sell only high oxygen content fuel during winter months (when carbon monoxide levels are highest);

(2) large employers reduce the amount of single car commuting by their employees;

(3) automobiles be tested for emission levels while under load as well as while idling.

Petitioners point out that neither the Maricopa plan nor the Pima plan adopts most of the forty-five measures recommended in a study of Maricopa County conducted by the Maricopa Association of Governments, a regional planning organization. Similarly, neither plan adopts most of the twelve measures recommended by Cambridge Systematics, a group that conducted an EPA–Sponsored study of Maricopa County. The excluded measures include major expansion of mass transit, imposition of parking controls, significant use of bus and carpool lanes, reductions in bus fares, restrictions on truck travel during peak periods, application of the Maricopa and Pima county oxygenated fuel program and automobile emission testing program to the entire state, elimination of waivers to the automo-

bile emission testing program, and adoption of year-round daylight savings time. The Maricopa Association of Governments noted that immediate implementation of all the measures it identified could have produced attainment within one year.

Petitioners contend that it was arbitrary and capricious for the EPA to approve the plans without more control measures. The EPA contends that it properly approved the Maricopa and Pima plans with just the three control measures that they contain, because additional control measures "could not be demonstrated to further accelerate the projected attainment date."

The EPA has, however, arbitrarily shifted from Arizona the burden of demonstrating that control measures would not accelerate the projected attainment date. An EPA guidance document explicitly provides that each of the eighteen measures listed in 42 U.S.C. § 7408 is presumed reasonably available; a state can reject one of these measures only by showing that the measure either would not advance attainment, would cause substantial widespread and long-term adverse impact, or would take too long to implement. The document states:

> [I]f a state adopts less than all [reasonably available control measures] *and demonstrates* (a) that reasonable further progress and attainment of the [national ambient air quality standards] are assured, and (b) that application of all [reasonably available control measures] would not result in attainment any faster, then a plan with less than all [reasonably available control measures] may be approved.

State Implementation Plans; General preamble for Proposed Rulemaking on Approval of Plan Revisions for Nonattainment Areas, 44 Fed.Reg. 20,375 (April 4, 1979) (emphasis added).

Neither the Maricopa plan nor the Pima plan contains serious commitment to many of the measures listed in section 7408, including: 1) limiting portions of roads to common carriers; 2) improving transit systems with major changes in existing facilities; 3) controlling on-street parking; 4) establishing auto-free zones; 5) instituting road user fees that discourage single occupant automobile trips; or 6) retrofitting older vehicles with emission control devices. *See* 42 U.S.C. § 7408(f)(1)(A)(v), (vi), (vii), (ix), (xiii), (xvii). Yet Arizona has made no claim that any of the control measures that section 7408 or the Maricopa Association of Governments identified is impracticable or unreasonable in either Maricopa County or Pima County.

Furthermore, as noted above, for a nonattainment area that qualified for deadline extension to 1987, the 1977 amendments require implementation of not only all reasonably available control measures, but also any additional measures necessary to ensure timely attainment. 42 U.S.C. § 7502(b)(11)(C). If such an area failed to attain the relevant ambient air quality standard by 1987, the EPA required implementation of "all possible measures" and more extensive evidence to justify failure to adopt any of the measures listed in section 7408 in order to ensure "the most expeditious [attainment] date beyond 1987." Criteria, 46 Fed.Reg. 7188 (January 22, 1981). The EPA expressly applied these requirements to nonattainment areas that failed to meet the 1982 statutory deadline and did not qualify for deadline extensions to 1987. Guidance Document for Correction of Part D SIP's For Nonattainment Areas, January 27, 1984, at 32–33 [hereinafter "Part D SIP's for Nonattainment Areas"].

We, therefore, conclude that the EPA arbitrarily and capriciously found that the Maricopa and Pima plans provide for sufficient control measures.

III. *The EPA's Decision that the Maricopa Plan Provides Adequate Contingency and Conformity Provision*

■ The EPA's published guidelines require post–1982 carbon monoxide implementation plan revisions to contain a contingency plan to be implemented if shortfalls in emission reductions occur during the period covered by the plan. *See* Criteria, 46 Fed.Reg. 7188 (January 22, 1981) (prescribing the policy for nonattainment extension areas). The contingency plan

must provide: (1) a list of planned transportation measures that may adversely affect air quality and that will be delayed while the state implementation plan is being revised, if expected emission reductions or air quality improvements do not occur; and (2) a description of the process that will be used to determine and implement additional transportation measures beneficial to air quality that will compensate for unanticipated shortfalls in emission reductions. *Id.*

The Maricopa plan contains neither of these. Petitioners contend that the EPA arbitrarily and capriciously waived its contingency plan requirement. The EPA contends that its contingency plan provision applies only to nonattainment extension areas. But as we note above, the EPA expressly applied its nonattainment extension area requirements to nonattainment nonextension areas. *See* Part D SIP's for Nonattainment Areas, at 32–33. Indeed, it would be anomalous for the EPA not to require as stringent measures for delinquent areas as for areas that qualified for extensions.

The EPA alternatively contends that each plan contains two traffic control measures beyond those necessary to demonstrate attainment by December 31, 1991, and that these additional measures are the functional equivalent of a contingency plan. We disagree. First, we held above that the EPA erred in not requiring compliance before December 31, 1991. Second, the EPA concedes that the two traffic control measures in question—a voluntary no-drive day program and a minimum market share for alcohol fuels—are of such speculative value that the EPA could not assign them any emission reduction value. *See* Approval and Promulgation of Implementation Plans; Arizona State Implementation Plan Revision; Maricopa County Carbon Monoxide Plan, 53 Fed.Reg. 30,232 (August 10, 1988) [hereinafter "Approval of Maricopa Plan"]. Programs of such speculative benefit are not the functional equivalent of a list of specific projects that will be delayed and a description of the specific process that will be used to determine and implement additional transportation control measures if they become necessary. We find

that the EPA has arbitrarily and capriciously waived its requirement of a contingency plan.

The Clean Air Act explicitly requires that all federal activities conform to Clean Air Act Implementation Plans. 42 U.S.C. § 7506(c). The EPA guidelines direct that to assure compliance with this mandate, each implementation plan "should identify, to the extent possible, the direct and indirect emissions associated with major federal actions...." Criteria, 46 Fed.Reg. 7188 (January 22, 1981). The state implementation plan must contain "[a]dministrative and technical procedures and agency responsibilities for ensuring ... that transportation plans, programs and projects" will conform with the state implementation plan. *Id.* The EPA does not dispute that the Maricopa plan fails to meet either requirement. Petitioners argue that the EPA arbitrarily and capriciously waived these requirements. The EPA argues, however, that we should sustain as within its discretion, its finding that the plan sufficiently assures conformity "given the flexibility which should be accorded [the EPA's] practical implementation of the [Clean Air Act]'s statutory provisions."

Again, we cannot agree. The EPA must adhere to its own guidelines. *Morton v. Ruiz,* 415 U.S. 199, 235, 94 S.Ct. 1055, 1074, 39 L.Ed.2d 270 (1974); *Service v. Dulles,* 354 U.S. 363, 388, 77 S.Ct. 1152, 1165, 1 L.Ed.2d 1403 (1957). Because it is undisputed that the Maricopa plan fails to meet either of the EPA's own requirements and the EPA offers no reason for waiving those requirements, we can conclude only that the EPA arbitrarily and capriciously approved the plan. *See Illinois State Chamber of Commerce v. EPA,* 775 F.2d 1141, 1147 (7th Cir.1985).

IV. *The EPA's Decision that the Maricopa Plan Provides Adequate Maintenance of the National Ambient Air Quality Standards*

■ The Clean Air Act requires that implementation plans provide for maintenance of national ambient air quality standards after attainment. 42 U.S.C.

§ 7410(a)(2)(B). Petitioners contend that the Maricopa provisions for maintenance are inadequate because the plan considers air quality only ten years into the future. The EPA required projections only ten years into the future because it found that projections beyond ten years are unreliable. Of course, this finding would not have justified the EPA's disregard for its rules without a formal revision of the rules in accordance with the Administrative Procedure Act. But even assuming that the EPA's own rule generally requires maintenance projections twenty years into the future applies to delinquent nonattainment nonextension areas (which the EPA disputes), that rule allows plans to provide maintenance projections only ten years into the future. The rule states:

> The time period analyzed shall extend at least 20 years or, if modified under § 51.63, not less than 10 years from the date on which the Administrator identified the area.

40 C.F.R. § 451.42 (1987). Section 51.63(a) adds:

> At the request of a State, or under his own initiative, the Administrator, where he determines it appropriate, may approve alternative [air quality maintenance area] analysis and plan development procedures as allowed under §§ 51.42, 51.44, 51.45, 51.46, 51.48(b), and 51.60(a). He may consider all relevant factors including but not limited to air quality problems, financial and manpower limitations, administrative feasibility, and existing commitments by the State.

40 C.F.R. § 51.63(a) (1987).

The preamble to these regulations specifically states that one of Section 51.63(a)'s "relevant factors" is the reliability of the maintenance projections:

> The time periods will be selected by the Administrator, through his Regional Administrators, considering such factors as State resources, other planning programs that may significantly affect air quality, *the reliability of projections*, and the extent of present and potential air quality problems.

Maintenance of National Air Quality Standards—Summary, 41 Fed.Reg. 18,386 (May 3, 1976) (emphasis added).

In this case, the EPA specifically found that projections beyond ten years into the future "become too speculative to be reliable." Approval of Maricopa Plan, 53 Fed. Reg. 30,234 (August 10, 1988). Petitioners' own contention that traffic projections changed dramatically from February 1987 to October 1987 supports the EPA's conclusion that projections are quite speculative. We, therefore, cannot say that the EPA arbitrarily or capriciously required a maintenance projection only ten years into the future.

## V. The EPA's Decision not to Consider Revised, Increased Vehicle Traffic Projections in Evaluating the Maricopa Plan

The Maricopa plan based its projection that Maricopa County would attain the carbon monoxide ambient air quality standard by 1991 on traffic projections made in 1984 and in February 1987. The EPA refused to consider revised, increased vehicle traffic projections for Maricopa County that petitioners presented during the public comment period for the Maricopa plan. The EPA argues that petitioners submitted this new data only four weeks before the approval deadline and thus the EPA lacked sufficient time to incorporate it into the plan. Petitioners contend that the EPA acted arbitrarily and capriciously in failing to consider the revised, increased vehicle traffic projections. They also contend that the EPA's decision that the Maricopa plan provides adequate maintenance of the national ambient air quality standards was arbitrary and capricious because it failed to rely on the revised vehicle traffic projections.

We do not determine whether the EPA acted arbitrarily and capriciously in its decision not to consider the revised traffic projections. Our holdings on the other issues in this case require the EPA to develop a new Maricopa county implementation plan. To develop that plan properly the EPA and Arizona will, of course, need to consid-

er the most recent vehicle traffic projections currently available. Whether, due to time constraints, the EPA in 1988 justifiably refused to consider the revised, increased traffic projections is now an issue of only academic significance.

## CONCLUSION

We grant the petition for review. We vacate the EPA's approvals of Maricopa and Pima counties' Clean Air Act implementation plans. We direct the EPA to disapprove these plans and to promulgate federal implementation plans consistent with this opinion within six months.[1] To summarize, the new plans must utilize all available control measures to attain the carbon monoxide ambient air quality standard as soon as possible. The new plans must contain contingency and conformity plans in accordance with EPA guidelines and must be based on the most recent traffic projections currently available. We grant petitioners' motion for fees and costs and direct petitioners to submit appropriate documentation to this court.

---

1. Arizona may, of course, submit proposals to the EPA for its consideration in developing the plans.