CITIZENS FOR A BETTER ENVIRONMENT, et al., Plaintiffs,

v.

George DEUKMEJIAN, et al., Defendants.

SIERRA CLUB, Plaintiff,

v.

METROPOLITAN TRANSPORTATION COMMISSION, et al., Defendants.

Nos. C89–2044 TEH, C89–2064 TEH.

United States District Court, N.D. California.

Aug. 28, 1990.

Alan Ramo, Citizens for a Better Environment, Ephraim Margolin, Nicholas C. Arguimbau, Robert M. Teets, Jr., for plaintiffs.

William S. Curtiss, Sierra Club Legal Defense Fund, Inc., San Francisco, Cal., Alan Waltner, Gorman & Waltner, Oakland, Cal., Roger Beers, San Francisco, Cal., for Sierra Club.

Francis Chin, Gen. Counsel, Melanie Morgan, Associate Gen. Counsel, Metropolitan Transp. Comm'n, Oakland, Cal., John F. Powell, Counsel, Laurence G. Chaset, Sr. Asst. Counsel, Thomas H. Crawford, Asst. Counsel, Bay Area Air Quality Management Dist., John K. Van de Kamp, Atty. Gen., Robert H. Connett, Asst. Atty. Gen., M. Anne Jennings, Deputy Atty. Gen., Charlotte Uram, Robert L. Hines, Landels, Ripley & Diamond, San Francisco, Cal., David P. Novello, U.S.E.P.A., Washington, D.C., Robert D. Wyatt, David D. Cooke, Kimberly M. McMorrow, Brobeck, Phleger & Harrison, San Francisco, Cal., David J. Kaplan, Justice Dept., Washington, D.C., Patrick Bupara, Asst. U.S. Atty., San Francisco, Cal., for defendants.

## ORDER

THELTON E. HENDERSON, District Judge.

This matter came before the Court on plaintiffs' motion for reconsideration on May 31, 1990. On June 25, 1990 the parties submitted additional data and information upon request of the Court. After careful consideration of all written and oral arguments, and supporting documents, the Court grants in part, and denies in part, plaintiffs' motion for the reasons set forth below.

## I. BACKGROUND

As explained more fully in this Court's earlier opinion,[1] plaintiffs brought this action under the Clean Air Act ("Act"), 42 U.S.C. §§ 7401, et seq. to remedy the failure of state and local agencies to fully comply with the "1982 Bay Area Air Quality Plan." This federally mandated "1982 Plan" was designed to bring the San Francisco Bay Area into compliance with minimum federal air quality standards for ozone and carbon monoxide, two particularly harmful pollutants.

After extensive briefing and hearings, this Court found defendants California State Air Resources Board ("ARB"), Metropolitan Transportation Commission ("MTC"), and Bay Area Air Quality Management District ("District") liable for failing to implement certain portions of the 1982 Plan, and imposed strict timetables which required corrective action as "expeditiously as practicable." *CBE v. Deukmejian*, 731 F.Supp. at 1458–162, and Order of January 10, 1990.

Plaintiffs now urge the Court to reconsider two aspects of our previous holdings. First, they seek reconsideration of this Court's determination that defendants are not liable for violating the 1982 Plan's "contingency plan" with respect to stationary sources of pollution. Second, plaintiffs contend that, in fashioning its remedy, the Court should have employed a standard that required action as "soon as possible" rather than as "expeditiously as practicable." Each of these contentions is addressed in turn.

## II. CONTINGENCY PLAN WITH RESPECT TO STATIONARY SOURCES

The overall aim of the 1982 Plan was to attain National Ambient Air Quality Standards ("NAAQS") for ozone and carbon monoxide by 1987, the deadline legislated by Congress. The 1982 Plan's primary strategy for achieving this goal for ozone was to reduce hydrocarbon emissions[2] through (1) an Inspection and Maintenance ("I & M") Program for automobiles and (2) emission control measures for 23 categories of stationary sources.[3] *CBE v. Deukmejian*, 731 F.Supp. at 1453, 1982 Plan at 3–5.

The 1982 Plan also required that defendants make "Reasonable Further Progress" ("RFP") toward attainment each year. If the Plan's "primary" strategy, described above, failed to yield RFP in the Bay Area for any given year,[4] defendants were required to implement the 1982 Plan's "contingency plan," which mandated adoption of additional measures to further reduce emissions in both the stationary source and transportation sector. *Id.*

As we previously found, the Bay Area failed to achieve RFP for several years, thus triggering defendants' duty to implement the contingency plan. *Id.* The instant dispute centers on the exact scope of that duty with respect to stationary sources. In their original motions for summary judgment, plaintiffs argued that the 1982 Plan's contingency plan required defendants to adopt, absent a showing of RFP, sufficient additional stationary source control measures to attain NAAQS for ozone. *Id.* We rejected this interpretation of the contingency plan as being unsupported by the language of the 1982 Plan and contrary to case law which precludes enforcement of a plan's goals apart from specific strategies contained in the plan to achieve those goals. *Id.*

Plaintiffs now take a different and more

---

1. *See Citizens for a Better Environment v. Deukmejian*, 731 F.Supp. 1448 (N.D.Cal.1990).

2. Ozone, harmful at ground level, is formed by complex photo-chemical reactions involving hydrocarbons, nitrogen oxides, and sunlight. *CBE v. Deukmejian*, 731 F.Supp. at 1451.

3. The 1982 Plan also anticipated that a slight 2.7 ton per day reduction in ozone contributing

emissions would be achieved through various transportation sector measures. However, these measures were considered too minimal to be included in the 1982 Plan's calculations. *See* 48 Fed.Reg. 5074, 5080 (Feb. 3, 1983), and 1982 Plan at 104.

4. The 1982 Plan required that RFP assessments be made on an annual basis. 1982 Plan at 11.

meritorious tack.[5] The 1982 Plan may not require sufficient contingency measures to attain NAAQS, they concede, but it does require sufficient contingency measures to make reasonable further progress. We agree that a fair reading of the 1982 Plan compels this conclusion, and defendants do not appear to strenuously disagree. Rather, the more serious dispute concerns **how** RFP should be measured.

### (1) *Scope of the contingency plan*

▪ We start with the unassailable premise that the 1982 Plan commits defendants to make reasonable further progress, however that might be defined. 1982 Plan at 33 ("[The 1982 Plan] ... will provide for reasonable further progress in the interim"), and 34; *see also*, 42 U.S.C. § 7502(b)(3) (plan provisions **shall require, in the interim, reasonable further progress**); 48 Fed.Reg. 5074, 5080 (Feb. 3, 1983) ("[The 1982 Plan] contains a strategy.... which will provide for reasonable further progress").

Equally plain is the Plan's commitment, expressed numerous times, to adopt contingency measures in the event reasonable further progress is not made. For example, the Plan explains that:

The [1982 Plan is] divided into two parts, addressing ozone and carbon monoxide separately. Each of these parts is further divided into primary and contingency components: the primary component contains those control measures that are recommended for implementation at this time; the contingency component contains those control measures that are recommended for later evaluation and implementation if it is demonstrated that

reasonable further progress toward attainment of federal standards cannot be achieved with the primary measures (emph. added).

*See also*, 1982 Plan at 11 ("If emissions are not decreasing at rates that will allow standard attainment by 1987, then further controls must be adopted and implemented"), and 34, 150; February 2, 1989 EPA letter to Boyd at 2 ("The 1982 Plan includes provisions to adopt contingency measures for both ozone and carbon monoxide if reasonable further progress is not achieved").

Nor does any party dispute that, if reasonable further progress has not been made, the **only** mechanism provided by the 1982 Plan to compensate for such failure and to achieve the required RFP is through implementation of the contingency plan. Indeed, it is apparent that the very purpose of the contingency plan was to ensure that defendants could meet their federally mandated obligation to make reasonable further progress toward attainment, should the "primary" strategy be delayed or lead to disappointing results.[6]

In short, the 1982 Plan committed to making reasonable further progress toward its ultimate goal of attainment. The Plan's means of satisfying this commitment—should its primary strategy falter—was through implementation of the contingency plan. As such, the only reasonable reading of the 1982 Plan is that it required, if necessary, that RFP be achieved by way of the contingency plan.

As we cautioned previously, "the Court is not at liberty to extrapolate from the Plan or flesh out strategies not expressly contained therein." *CBE v. Deukmejian,*

---

**5.** While the Court is not obliged to consider arguments on a motion for reconsideration that could have been made earlier, due to the importance of the issue, and the number of complex issues that were briefed simultaneously, we will entertain plaintiffs' motion in this instance. However, the parties should not view this as an invitation to "stagger" their arguments. Any attempts to intentionally engage in piecemeal litigation (which we do not believe is the case here) will be soundly rejected and subject the offending party to the risk of sanctions.

**6.** *See* 1982 Plan at 101:

"Circumstances which could make it necessary to review and develop selected contingency measures [include]:
—Inspection/Maintenance program less effective than 29 tons/day;
—One or more of the recommended measures less effective than present analysis indicates;
—Delays in adoption of regulations or delays in compliance;
—Multiple exemptions change reduction estimates;
—Air monitoring data does not show air quality improvement."

731 F.Supp. at 1459. Here, the 1982 Plan expressly links implementation of the contingency plan to RFP, and requires that such progress be maintained throughout the term of the Plan. Thus, we are satisfied that this caution has been heeded here, and that our construction introduces no commitments or strategies not already present in the 1982 Plan.

Indeed, the above interpretation of the contingency plan is in marked contrast to the approach we previously rejected. That approach, as described above, tied implementation of the contingency plan to the attainment of NAAQS. The 1982 Plan, however, never "expressly links the number of [contingency measures] to the attainment of NAAQS or expressly commits to sufficient contingency measures to attain NAAQS." *Id.* Thus, plaintiffs' approach would have required the Court to "extrapolate from the Plan" and flesh out a strategy not expressly contained therein. *Id.*

Given the Plan's failure to link the contingency plan to NAAQS, plaintiffs' initial approach also suffered from an additional flaw. As courts have made clear, the National Ambient Air Quality Standards can not be enforced directly; rather, we can only compel performance of specific strategies set forth in a state implementation plan ("SIP"), such as the 1982 Plan, to achieve those standards. *Id.* Without the crucial link between the contingency plan and NAAQS, plaintiffs' approach would have effectively resulted in the Court enforcing NAAQS directly, rather than a SIP strategy to achieve NAAQS.

Defendants mistakenly contend that the interpretation we adopt today suffers from the same flaw. They argue that RFP and NAAQS are coincident because, had the projections of the 1982 Plan been accurate, and had the 1982 Plan been fully enforced, then achieving RFP would have ultimately resulted in the attainment of NAAQS. Enforcing the contingency plan, as we interpret it today, would not, however, cause the court to "simply enforce NAAQS directly."

First, the Court would be enforcing the *contingency plan,* an express strategy for attaining NAAQS. Although enforcement of this strategy might possibly result in attainment, it is distinct from simply ordering that NAAQS be achieved without anchoring that order on any specified strategy. Plainly, the fact that a specified strategy might be successful and lead to attainment does not render that strategy unenforceable.

Second, whether the air in the San Francisco Bay Area satisfies the National Ambient Air Quality Standards at any given time is an independent factual matter. The contingency plan, however only represents a commitment to make a specified degree of "reasonable progress" with respect to hydrocarbon emissions by 1987. Whether this specified degree of progress actually results in attainment is another question. True, Plan drafters thought that the reasonable further progress chart they committed to would, in fact, achieve NAAQS. The two concepts, however, are quite distinct, as is underscored by present data suggesting that even were the "reasonable progress" committed to in the Plan achieved today, Bay Area air would still violate NAAQS.[7] Thus, enforcing the contingency plan would not, as defendants suggest, require the court to "redraw" the 1982 Plan's RFP chart so that it will attain NAAQS; rather, it simply involves enforcing the progress committed to in the 1982 Plan.

In sum, we conclude that there can be no genuine dispute that the 1982 Plan committed to the adoption of sufficient contingency measures to achieve RFP. We further conclude that this interpretation of the con-

---

7. According to Edward Miller, Intergovernmental Projects Specialist in the Planning Division of the District, "[i]t is very likely that the level of allowable District-wide ROG [reactive organic gases] emissions which would enable the District to attain the *national ambient air quality standard for ozone,* using the 1987 inventory and the new air quality model, will be substantially different than the 430 tons per day level ... [the 1982 Plan anticipated would be required]. Miller Decl. at ¶ 13. The ARB also states that the level of emissions needed to attain NAAQS today is presently unknown. Lovelace Decl. at ¶¶ 5, 7.

tingency plan does not result in enforcing NAAQS directly. Rather, it will simply result in the enforcement of the 1982 Plan's strategy to achieve that goal. And although compliance with the 1982 contingency plan will probably *not* result in attainment, as long as the 1982 Plan is in effect, plaintiffs, and the citizens they represent, are entitled to what ever additional benefits full implementation may bring.

### (2) *Compliance*

■ Having determined that the contingency plan requires adoption of sufficient contingency measures to make reasonable further progress, we now turn to whether defendants are liable for violating this commitment with respect to stationary sources.

As mentioned above, the parties disagree as to how reasonable further progress should be measured. Figure 1 of the 1982 Plan consists of a graph which charts the progress defendants promised to achieve with respect to ozone. Plan at 10, 113. Based on data then available, the graph shows that hydrocarbon emissions in 1979 were 732 tons per day ("tpd") and that with implementation of the 1982 Plan, reasonable further progress would reduce emissions to a level of 430 tpd by 1987. Thus, RFP is depicted in terms of a downward slope in emission levels from 732 tpd to 430 tpd. *Id.; see also*, 1987 RFP Report, Fig. 9, Miller Decl. at ¶ 3 and Exh. A (copy attached). Even without the 1982 Plan, emissions were expected to decrease to 515 tpd based on existing programs. Thus, the Plan called for various control measures, which as phased in, would reduce emissions from specific sources by an additional 85 tpd by 1987—enough to make up the difference between 515 tpd and 430 tpd.

Plaintiffs contend that defendants' progress must be measured by how much the overall hydrocarbon emissions level has been reduced (regardless of whether that level achieves NAAQS). Since the RFP graph equates RFP in 1987 with an emissions level of 430 tpd, and it is now long past 1987, plaintiffs contend that defendants' compliance must be measured against this figure.

Defendants, on the other hand, contend that the emission levels shown in the RFP graph merely represent unenforceable "goals." Reasonable further progress, they argue, should be measured solely by whether defendants have adopted measures that, in aggregate, will reduce emissions from specific sources by 85 tpd, whether or not this results in an emissions level of 430 tpd.

Defendants' liability, however, does not hinge on resolution of this dispute since their own data demonstrates that they are out of compliance under either definition. As of year end 1989, the emissions level for ozone, according to the District, was still 451 tpd (21 tpd *over* the 430 ton/day figure).[8] Hydrocarbon emission reductions from the I & M Program and all other stationary source control measures (primary and contingent) totalled only 70.6 tpd (14.4 tpd *short* of the 85 tpd figure). Miller Decl., Exh. F.

Thus, while a number of contingency measures in the stationary source sector have been adopted, defendants' own calculations establish that the reasonable further progress the 1982 Plan promised to make by *1987* has still not been achieved in 1990—regardless of which yardstick we use.

The reason for this shortfall is immaterial since liability in a citizen's enforcement action turns solely on the question of actual compliance. Because "[s]tates have an unwavering obligation to carry out federally mandated SIPs. . . . where a SIP is violated, liability attaches, regardless of the reasons for the violation." *CBE v. Deukmejian*, 731 F.Supp. at 1458. Accordingly, we conclude that defendants are liable for failing to fully implement the contingency plan, with respect to stationary

---

**8.** According to William Lovelace, manager of the Area Source and Motor Vehicle Section of the Emission Inventory Branch of the ARB's Technical Support Division, the most recent 1987 inventory data (which is based on different assumptions than was used in preparing the 1982 Plan), the emissions level for 1987 was 616 tons/day. Lovelace Decl. at ¶ 4.

sources.[9]

### (3) Remedy

Courts are "obligated, upon a showing that the state has violated [a plan], to issue appropriate orders for its enforcement." *Friends of the Earth v. Carey,* 535 F.2d 165, 173 (2nd Cir.1976) (emph. added). Defendants say, however, that they have already embarked on an expeditious schedule to achieve the reasonable further progress committed to in the 1982 Plan. Thus, they urge, even if liability is found, no remedial order is necessary to ensure compliance at this juncture. However, as we have responded to this similar refrain before, defendants' past history, and the Court's experience with this litigation, convinces us that continuing judicial oversight at the remedial stage is necessary to ensure timely compliance. Thus, we turn to the appropriate timetable and scope of the remedy.

Using projections from the 1979 base year emissions inventory,[10] the District represents that defendants can reduce hydrocarbon emissions by a total of 99.1 tpd by the end of 1991, based on stationary source measures already implemented or planned for implementation, and an enhanced I & M Program. Miller Decl. at pps. 14–16, and Exh. F. The District further projects that these same measures will achieve a basinwide emissions level of 429.9 tpd by the end of 1991. *Id.*[11]

Since it is defendants who represent that they can in fact achieve reasonable further progress—whether defined by the 85 tpd target reduction figure or the 430 tpd emissions level—by the end of 1991, they can not complain that a 1991 deadline is impracticable. We also note that plaintiffs do not contend that these reductions and levels

can be achieved any *earlier.* Thus, we conclude that a December 31, 1991 deadline for making RFP for ozone will achieve compliance with contingency plan with respect to stationary sources as soon as practicable.

The Court leaves to defendants' expertise whether further measures will be necessary to satisfy the 1991 deadline. However, it will be defendants' burden to demonstrate compliance (based on the assumptions and methodology used in preparation of the 1982 Plan) or explain why compliance was not possible, should enforcement of the 1991 deadline become an issue.[12]

■ Finally, we address the issue of how RFP is measured. While the parties' competing definitions did not affect our liability determination, it is relevant to the scope of this remedial order. For despite the representation that RFP can be made by 1991 under either definition, defendants contend that any court ordered deadline should apply only to the targeted 85 tpd reduction in hydrocarbon emissions. Plaintiffs, on the other hand, contend that RFP must be measured by the 430 tpd emissions level depicted on the RFP graph.

We conclude that both parties are right; the 1982 Plan measures RFP by **both** the emissions level and the target reductions, as the two figures are essentially two sides of the same coin. Based on the methodology and data then available, the 1982 Plan drafters contemplated that a 430 tpd emissions level would enable the San Francisco Bay Area to achieve NAAQS for ozone. They further determined that, absent implementation of the 1982 Plan, the emissions level would be 515 tpd by 1987.

---

9. The 1982 Plan did not require that all shortfalls with respect to ozone be compensated for entirely by the stationary source sector. Additional progress could be made from the I & M Program or other transportation related measures. For liability purposes, however, no party contests that, in the event this Court determined that RFP had not been made, that the stationary source sector would be responsible for some extent of the shortfall.

10. The 1979 base year emissions inventory was used in determining the RFP line in the 1982 Plan. Miller Decl. at pps. 11–12.

11. No other defendants have taken issue with the District's timetable.

12. The Court declines to act on plaintiffs' request that the District's projections, described above, be independently evaluated. However, if compliance is contested, the Court would not hesitate to seek independent verification at that point.

Thus, the 85 tpd reduction target—the reduction necessary to close the gap between 515 tpd and 430 tpd—is simply a function of subtracting 430 from 515.

Viewed in this context, it is clear that the emissions level and the 85 tpd figure are inextricably intertwined. While the Plan contemplated that a 85 tpd reduction would, in turn, achieve a 430 tpd emission level, it was the emissions level that determined the 85 tpd calculation in the first place. Indeed, the 85 tpd figure has no independent significance other than its contribution toward achieving a specific desired emissions level.

The Clean Air Act's definition of RFP is consistent with our dual approach toward reasonable further progress. It provides that RFP "means annual incremental reductions in emissions of the applicable air pollutant ... which are sufficient in the judgment of the Administrator, to provide for attainment of the applicable national ambient air quality standard by the date required in section 7502(a) of this title." 42 U.S.C. § 7501. Because reducing emissions sufficiently to attain NAAQS necessarily requires reducing emission levels, both of these aspects of making "reasonable further progress" are encompassed by this definition.

The Court's approach is also most consistent with the Clean Air Act's mandate that SIP strategies lead to attainment. *CBE v. Deukmejian*, 731 F.Supp. at 1452, 1455. Since the 1982 Plan represented that a 430 tpd emissions level would allow attainment, the Plan necessarily committed to making reasonable further progress toward this level in order to satisfy its obligation to devise a strategy sufficient to achieve NAAQS. While, as mentioned above, hindsight may show that a 430 tpd emission level will not, in fact, allow attainment, this circumstance does not detract from the underlying commitment to achieve the promised emissions level.

The 1982 Plan also comports with this approach. The RFP graph, itself, is framed in terms of emission levels. 1982 Plan at 10. The Plan naturally focuses on the 85 tpd target reductions as well; however, this is because it was assumed that an 85 tpd reduction would achieve the 430 tpd emissions level. *See also*, 1982 Plan at 112, Table 27 (charting yearly progress in terms of target reductions and emissions levels). The 1987 RFP Report, prepared by the District, MTC, and the Association of Bay Area Governments assesses RFP for ozone in terms of both target reductions and emission levels. With respect to the latter, the Report notes that the 1987 emissions level exceeded the 430 tpd level allowed by the RFP line. "The present estimate," the Report explains, "of ROG [hydrocarbon] emissions in 1987 is 473 tpd ... [which] is 43 tpd more than *the RFP line from the 1982 Plan.*" Bay Area Air Quality 1987 RFP Report (November 1988) at 16; *see also, id.* at 23 ("RFP Chart" drawn in terms of emission levels).

The EPA has also construed the 1982 Plan's RFP commitment to encompass the emission levels contained in the RFP graph. In a February 14, 1990 letter to MTC, the EPA voiced various objections to MTC's "Proposed Transportation Control Measures for the Contingency Plan." This proposal was drafted in response to this Court's order that MTC implement the contingency plan for the transportation sector, which required adoption of sufficient contingency measures to "bring the region back within the RFP line." 1982 Plan at H–2. EPA's letter plainly advises MTC that its contingency plan *"must show* that the contingency [transportation control measures] are sufficient to reduce current levels of emissions of [Hydrocarbons] and [carbon monoxide] in the transportation sector to *the emission levels for 1987 committed to in the 1982 Plan.*" Sierra Club's Reply Memorandum, Exh. B., Attachment A at 2 (emph. added).[13]

---

13. The letter went on to observe that "[the transportation control measures] adopted in the contingency plan *need not bring the area into attainment of the ozone and [carbon monoxide]*

NAAQS, *but only reduce emissions in the transportation sector to the levels projected for 1987 in the 1982 Plan.*" *Id.* (emph. added).

Accordingly, we conclude that the reasonable further progress committed to in the 1982 Plan must be measured (using the assumptions and methodologies upon which the 1982 Plan is based), not only by target reductions achieved, but by the overall emissions level as well. We simply can not accept defendants' contention that the 1982 Plan committed *only* to the 85 tpd target reductions. To do so would ignore the reality, plainly acknowledged by the Plan, that *actual* progress toward achieving NAAQS is predicated on improving emission levels—not merely achieving some particular amount of tonnage reduction.[14] Accordingly, the scope of the remedial order will extend to both the target reduction and emission level components of making reasonable further progress.[15]

## III. REMEDIAL STANDARD

■ In this Court's January 10, 1990 Order Re Consumer Solvents, we ordered defendants to take certain remedial action based on a timetable that was as "expeditious[ ] as practicable," or as expeditious as "feasible." Order at 4, 8 (quoting *American Lung Ass'n v. Kean*, 26 E.R.C. 1865, 1867, 1870, 1872 (D.N.J.1987)). Based on a subsequent decision by the Ninth Circuit Court of Appeals in *Delaney v. Environmental Protection Agency [EPA]*, 898 F.2d 687 (9th Cir.1990), plaintiffs contend that the proper standard should be as "soon as possible."

Plaintiffs do not, however, seek revision of any remedial timetable the Court has imposed. They agree that the present deadlines already require action "as soon as possible." Rather, they bring this motion to correct the Court's alleged misstatement of the law, and to ensure that the correct standard is applied from this point forward.

The Clean Air Act, itself, does not address what standard courts should employ in determining how quickly plan violations must be remedied, once liability for such violations is established in a citizens enforcement action. Congress, however, did specify that state implementation plans must provide for attainment of NAAQS "as expeditiously as practicable." 42 U.S.C. § 7502(a)(2).

Plaintiffs contend that while this "practicable" standard applies to SIP provisions designed to achieve attainment by December 31, 1987, *Delaney* mandates that the more stringent "possible" standard apply to remedial orders, at least where the 1987 deadline has passed. We conclude, however, that while *Delaney* contains supportive language, it does not compel use of the "possible" standard when fashioning a remedy. Nor do we agree that adoption of the "possible" standard is otherwise warranted, given that the two standards, properly interpreted in the context of a citizens enforcement action, are virtually interchangeable.

*Delaney* concerned a challenge to EPA's approval of SIPs for Pima and Maricopa counties in Arizona. Those SIPs contained measures designed to achieve NAAQS over the next three years, although the applicable 1982 deadline had long since passed. The Ninth Circuit overturned EPA's approval, holding that EPA had acted arbitrarily by allowing the counties three additional years to reach attainment. Rather, given the passage of the 1982 deadline, and pertinent EPA SIP approval guidelines, the Arizona SIPs should have provided for attainment "as soon as possible," using all available control measures. Thus, *Delaney* concerned standards for SIP approval, not the scope of the court's discretion in fashioning a remedy in a citizen's enforcement action. *Delaney*, 898 F.2d at 688–692.

14. Indeed, the 1982 Plan calls for contingency measures not just in the event the primary measures are less effective than expected, but also if "air monitoring data does not show air quality improvement." 1982 Plan at 101.

15. With respect to the 85 tpd component of RFP, stationary sources are responsible for 56 of the 85 tpd. 1982 Plan at 101. The commitment to achieve a 430 tpd emissions level concerns all sources, 1982 Plan at 94–117, and is a joint obligation of the ARB, the District, and MTC. MTC has already been ordered to implement the contingency plan with respect to the transportation sector. *CBE v. Deukmejian*, 731 F.Supp. at 1461.

Because *Delaney* is not precisely on point, it does not require reconsideration of the "expeditiously as practicable" standard in the context presented here. We also note that although the *Delaney* opinion utilized the "as soon as possible" standard, employed by EPA guidelines, it did not do so out of rejection of the "practicable" standard or out of concern that the two standards differed. Rather, it simply had no occasion to compare them. Indeed, the *Delaney* court appeared to blur them when it criticized Arizona for rejecting measures without demonstrating that such measures were "impracticable" or "unreasonable." *Id.* at 692.

This brings us to our second point, which is that plaintiffs' motion raises an issue more of semantics than substance. As EPA national guidance documents observed, " 'the legislative history shows that Congress set up [the Act] in order to force communities and industry to do their utmost to bring about attainment as rapidly as possible.' " *Id.* at 691. The urgency expressed by Congress has made the Act's deadlines the "heart" of the statute, *Delaney*, 898 F.2d at 690. Thus, at the late date of a remedial order, there can be no quarrel that time is truly of the essence. *CBE v. Deukmejian*, 731 F.Supp. at 1461.

Given this context, we believe that the standard "as expeditiously as practicable" should lead to no different result than the standard "as soon as possible." Under either, courts must require that overdue SIP commitments be satisfied without delay and without rebalancing costs and benefits already balanced. *American Lung Ass'n v. Kean*, 26 E.R.C. 1865, 1870 (D.N.J.1987). As a practical matter, however, no Court will use its equitable powers to impose remedies that are irrational, albeit "possible." Thus, as long as time is considered paramount, and the term "practical" is strictly construed in keeping with the purposes of the Act, the "as expeditiously as practicable" standard should yield no less results than an "as soon as possible" standard. The fact that plaintiffs agree that the timetables set in this case already require that action be taken as "as soon as possible," underscores the fact that, when properly interpreted, there is no practical distinction between the two standards. Under these circumstances, we are not persuaded that the Court should or need depart from the "as expeditiously as practicable standard" contained in the Act.

Accordingly, and good cause appearing, it is HEREBY ORDERED that:

1. Plaintiffs' motion for reconsideration is denied in part, and granted in part, consistent with this decision,

2. Defendants District and the ARB are liable for failing to fully implement the contingency plan with respect to stationary sources.

3. Defendants District and the ARB shall satisfy the requirements of contingency plan with respect to stationary sources, as interpreted herein, no later than December 31, 1991.

IT IS SO ORDERED.

[See page 986 for Exhibit A.]

EXHIBIT A

REASONABLE FURTHER PROGRESS CHART

Fig. 9.

LEGEND

—— Baseline

—|— RFP Line

······ G & C Line

—·— Attainment

Reactive Organics Emissions — Tons/day

800  750  700  650  600  550  500  450  400

1979   1981   1983   1985   1987
Years
Figure 1