CITIZENS FOR A BETTER
ENVIRONMENT, et al.,
Plaintiffs,

v.

Pete B. WILSON, et al., Defendants.

SIERRA CLUB, Plaintiff,

v.

METROPOLITAN TRANSPORTATION
COMMISSION, et al., Defendants.

Nos. C89–2044 TEH, C89–2064 TEH.

United States District Court,
N.D. California.

Aug. 19, 1991.

William S. Curtiss, Sierra Club Legal Defense Fund, Inc., San Francisco, Cal., Alan Waltner, Gorman & Waltner, Oakland, Cal., Roger Beers, San Francisco, Cal., for plaintiffs Citizens for a Better Environment, Jean Siri and Sierra Club.

Daniel E. Lungren, Robert H. Connett, M. A. Jennings, Cal. State Atty. Gen. Office, San Francisco, Cal., for defendants Ass'n of Bay Area Governments, Bay Area Air Quality Management Dist., CA Air Resources Bd., George Deukmejian and Pete B. Wilson, Cal. Governors and James D. Boyd.

David D. Cooke, Robert D. Wyatt, Beveridge & Diamond, San Francisco, Cal., for defendant Metropolitan Transp. Com'n.

George Rios, Joan R. Gallo, San Jose City Attys. Office, San Jose, Cal., for amici

curiae City of Mountain View, County of Santa Clara and City of San Jose.

## DECISION AND ORDER

THELTON E. HENDERSON, Chief Judge.

This matter came before the Court on May 9, 1991, and June 18, 1991, on plaintiffs' Motion for Contempt, or in the Alternative, Summary Judgment Regarding Transportation Control Measures, and the Metropolitan Transportation Commission's ("MTC") Cross–Motion for Partial Summary Judgment. The Court subsequently ordered supplemental briefing. Now, having considered all of the parties' oral arguments and written submissions, and having consulted with the court appointed neutral expert Professor Martin Wachs of the University of California at Los Angeles, concerning the technical issues raised by plaintiffs' motion for contempt or summary judgment, the Court denies MTC's cross-motion and grants in part, and denies in part, plaintiffs' motion for contempt or summary judgment for the reasons set forth below.

## BACKGROUND

The 1982 Bay Area Air Quality Plan ("1982 Plan"), which represents the plan for achieving minimum federal air quality standards in the Bay Area, required MTC to implement a contingency plan in the event the Bay Area was not making Reasonable Further Progress ("RFP") toward attaining the National Ambient Air Quality Standards ("NAAQS") for carbon monoxide and ozone. On September 19, 1989, we found that (1) RFP had not been made for ozone or carbon monoxide in the Bay Area, and (2) that MTC had nevertheless failed to implement the contingency plan for the transportation sector. *See, Citizens for a Better Environment v. Deukmejian*, 731 F.Supp. 1448 (N.D.Cal.1990) ("CBE I").

Accordingly, we ordered MTC to implement the contingency plan for the transportation sector, which contains two components. *Id.* at 1461. The second component, which is at issue here, required MTC to adopt, within six months, sufficient additional transportation control measures ("TCMs") to bring the region "back within the RFP line." *Id.* 1982 Plan at H–2. In response, MTC passed Resolution 2131 on February 28, 1990, adopting 16 additional TCMs.

These 16 additional TCMs (referred to by the parties as the "2131 TCMs" after the Resolution number) included, among other things, preservation of ferry services added after the October 1989 earthquake, fare coordination between BART and buses, expanding participation in Caltrans' Fuel Efficient Traffic Signal Management Program, and a request that the state legislature raise the Bay Bridge toll to two dollars. MTC estimated that these 16 measures would reduce hydrocarbon (or VOC—volatile organic compound) emissions, which are a precursor to ozone, by 3.83 tons per day ("tpd") by 1996. The measures were also estimated to reduce carbon monoxide emissions by 74.1 tpd by 1996. Brittle Decl., Exh. E; Plaintiff's Exh. A at 036.

Plaintiffs contend that the adoption of the above 16 measures did not fulfil MTC's obligation under the contingency plan because they will not achieve sufficient reductions to put the San Francisco Bay Area back on the "RFP line" *as defined in the 1982 Plan.* Accordingly, they urge us to find MTC in contempt of our September 19, 1989, ruling requiring MTC to adopt sufficient TCMs to bring the region back within the RFP line; alternatively, they seek a summary judgment that MTC is in continuing violation of the contingency plan.

MTC does not dispute its obligation, under the 1982 Plan's contingency plan, to adopt sufficient additional TCMs to put the Bay Area back on the RFP line. However, it contends that to determine whether the region is currently making reasonable further progress (and therefore "on the RFP line"), we must look to the new reduction schedules set forth in the recent 1990 amendments to the Clean Air Act ("1990 amendments"), rather than the RFP benchmarks committed to in the 1982 Plan. Thus, MTC moves for a partial summary judgment that the 1990 amendments sup-

plant any RFP benchmark required by the 1982 Plan.

MTC also contends that, in any event, the record demonstrates that RFP has been satisfied for the Bay Area for both ozone and carbon monoxide whether RFP is measured by the terms of the 1982 Plan or the 1990 amendments. Plaintiffs vigorously dispute this assertion and contend that MTC's calculations and projections are flawed in various respects. As MTC's cross-motion raises the threshold issue of which RFP standard MTC's efforts must be measured against, we address this motion first.

## DISCUSSION

### I.

*MTC's Cross–Motion for Summary Judgment*

■ MTC seeks a ruling that, as a matter of law, reasonable further progress must now be measured solely in accordance with the emission reduction schedules set forth in the 1990 amendments, and therefore MTC's efforts to satisfy its obligation under the 1982 Plan, to adopt sufficient additional TCMs to achieve RFP, should be evaluated only by reference to these schedules.

We begin by noting that the 1990 amendments did not change the general concept of "reasonable further progress." Under both the 1977 and the 1990 amendments, reasonable further progress denotes the annual incremental reductions in emissions that are necessary to achieve federal air quality standards (NAAQS) by the statutory deadline. 42 U.S.C. § 7501(1).[1] Every state implementation plan ("SIP") must contain enforceable measures that provide for reasonable further progress. 42 U.S.C. § 7502(b)(3) (1977) and § 7502(c)(2) (1990); *Delaney v. EPA*, 898 F.2d 687, 692 (9th Cir.1990); *Citizens for a Better Environment v. Deukmejian*, 746 F.Supp. 976, 979–80 (N.D.Cal.1990) (*"CBE II"*).

The 1982 Plan (the SIP for the Bay Area), contains RFP benchmarks for ozone and carbon monoxide based on data available at the time the Plan was prepared. Thus, for example, with respect to ozone, the 1982 Plan committed to an "RFP line" that required reducing hydrocarbon emissions by 85 tpd and achieving a 430 tpd hydrocarbon emissions level in the Bay Area by 1987, the then applicable statutory deadline. *CBE II*, 746 F.Supp. at 982–83. The 1982 Plan contemplated that if this and other RFP benchmarks committed to were satisfied, the Bay Area would achieve NAAQS for ozone and carbon monoxide by 1987.

Unfortunately, most areas, including the Bay Area, failed to achieve NAAQS by 1987. In response, Congress amended the Clean Air Act in 1990 to require that most SIPs, including the 1982 Plan, be revised over the next two to three years to provide for strategies that will result in attainment of NAAQS by the new statutory deadlines. *See* 42 U.S.C. §§ 7511a(b)(1)(A)(i), 7512a(a)(7). For the Bay Area, which has been designated a "moderate" non-attainment area, NAAQS for ozone must be achieved by 1996; NAAQS for carbon monoxide must be achieved by 1995.

Congress also added some additional teeth to the RFP requirement, hoping to avoid a repetition of its experience with the 1977 amendments, which generated disappointingly little compliance with the statutory deadline. Previously, RFP referred only to such annual incremental reductions that were sufficient in the judgment of the Administrator to allow for attainment by the statutory deadline; under the 1990 amendments it refers to such annual incremental reductions in emissions "as are required by this part" or that may be required by the Administrator for the purpose of ensuring that NAAQS are attained by the statutory deadline. 42 U.S.C. § 7501 (1977 and 1990).

The phrase "as are required by this part" refers to specific reduction schedules that

---

**1.** Citations to 42 U.S.C. shall refer to the 1990 amendments to the Clean Air Act unless otherwise specified.

must be incorporated into the new, revised SIPs. In moderate non-attainment areas, for example, the revised SIPs must demonstrate that hydrocarbon emissions will be reduced 15 percent by November 15, 1996 from the base year of 1990 (accounting for any growth) pursuant to section 182(b), 42 U.S.C. § 7511a(b)(1)(A)(i). Similarly, the revised SIPs must demonstrate that carbon monoxide (CO) levels will decline 23.73 percent in the Bay Area from current levels by December 31, 1995, beginning from base year 1989. Section 187(a)(7), 42 U.S.C. § 7512a(a)(7), and April 5, 1991 Order at 4.[2]

In short, once the SIP for the Bay Area is revised pursuant to the 1990 amendments, it will incorporate new RFP benchmarks reflecting the new reduction schedules provided by Congress. 42 U.S.C. § 7511a(b)(1)(A) (State *shall submit* SIP revision within three years that provides for 15 percent reduction in VOCs from baseline emissions, accounting for growth) (emph. added); 42 U.S.C. § 7512a(a)(7) (State *shall submit* a revision attainment of carbon monoxide NAAQS by applicable attainment date) (emph. added); 42 U.S.C. §§ 7502(c)(2), 7501(1).

MTC's motion poses the issue whether, notwithstanding the new reduction schedules noted above, Congress intended to hold agencies to their RFP commitments in existing SIPs during this interim SIP revision period.

One thing should be made immediately clear. This is not an "either-or" proposition. It is not a question of whether, between now and the time SIPs are formally revised, RFP obligations are governed *only* by the 1982 Plan or *only* by the 1990 amendments. The reductions required by the 1990 amendments "apply" during this interim period in the sense that the revised SIP for the Bay Area must be able to demonstrate that the reduction requirements contemplated by the amendments have been underway and that the percentage reductions will be satisfied by 1995 (for ozone) or 1996 (for CO). The question is, do the RFP commitments in the 1982 Plan remain enforceable during this interim period, or are obligations relating to RFP now governed *solely* by reference to the 1990 amendments.

Congress neglected to address this precise issue, either by statute or through legislative history,[3] thus creating some am-

**2.** The 23.73 percent CO figure is determined by the percentage by which the "design value" for the Bay Area exceeds the NAAQS standard for CO. The design value is the second highest reading of carbon monoxide emissions in the Bay Area in the year 1989. The 15 percent hydrocarbon figure applies to areas, such as the Bay Area, that have been designated "moderate" non-attainment areas. This percentage reduction should achieve NAAQS for ozone because the ozone design value for the Bay Area is 14.3 percent above NAAQS for ozone. MTC's Motion for Partial Summary Judgment at 8.

With respect to the 1989 base year for CO, the Court takes this opportunity to decline plaintiff's invitation set forth in footnote 45 of their Reply Memorandum in Support of Motion for Contempt and/or Summary Judgment Regarding Transportation Control Measures, to reconsider this issue.

**3.** MTC points *only* to *some* legislative history concerning the interim *conformity* requirements. (*See* this Court's December 21, 1990 Order for discussion of conformity generally). As MTC notes, the interim conformity requirements borrow from the reductions schedules set forth in sections 182 and 187, which will ultimately be incorporated into the revised SIPs required by the 1990 Amendments. MTC ar-

gues that since Congress expressly required that conformity, in the interim, be determined by reference to these new reduction schedules, that Congress must have also intended to replace RFP commitments in existing SIPs with sections 182 and 187.

However, had Congress intended such a result it could have easily so stated. In the absence of any expression of such intent, we decline to presume that Congress intended to void RFP commitments in existing SIPs simply because Congress chose to tie interim conformity determinations to the new reduction schedules. Indeed, there are various reasons why Congress could have chosen to treat the two subjects differently. For example, Congress knew that existing conformity provisions were largely being ignored. *See* December 21, 1990 Order at 13–14. Thus, Congress may have felt it necessary to impose express requirements relating to conformity during this interim period, and thought it reasonable to draw from the new reduction schedules to provide interim standards. However, the fact that Congress determined that there was a need for interim conformity requirements does not necessarily indicate an intent to relieve agencies of RFP commitments in existing SIPs during this interim period.

biguity and uncertainty, and there is no apparent case authority; thus, we turn to the statutory scheme and Congress' overall purposes to resolve this question. *In re Arizona Appetito's Stores, Inc.*, 893 F.2d 216, 219 (9th Cir.1990) ("[W]e must adopt the interpretation which 'can most fairly be said to be imbedded in the statute, in the sense of being most harmonious with its scheme and with the general purposes that Congress manifested' "). With these principles in mind, we turn to the statutory scheme and the overall purposes of the Clean Air Act.[4]

As described in *CBE I*, Congress' plan for achieving clean air centers on making states accountable through their respective SIPs. Once EPA approves a SIP, the state is required to comply with it unless *and until a new, revised SIP is formally approved and takes its place.* Absent such a formal revision, states are "relegated to a lone option: compliance [with the existing SIP]." *Friends of the Earth v. Carey*, 535 F.2d 165, 178 (2nd Cir.1976), *cert. denied*, 434 U.S. 902, 98 S.Ct. 296, 54 L.Ed.2d 188 (1977); *CBE I*, 731 F.Supp. at 1452, and n. 3 (and cases cited therein); *Natural Resources Defense Counsel v. New York*, 668 F.Supp. 848, 850–51 (S.D.N.Y.1987). To further enhance accountability, Congress gave citizens the right to enforce SIP strategies in federal court. 42 U.S.C. § 7604(a); *Friends of the Earth v. Carey*, 535 F.2d at 172–73 (the "very purpose of the citizens' liberal right of action is to stir slumbering agencies and to circumvent bureaucratic inaction that interferes with the scheduled satisfaction of the federal air quality goals").

Consistent with this, the 1990 amendments include two strongly worded savings clauses, one of which is pertinent here:

> *Any provision* of any applicable implementation plan that was approved or promulgated by the Administrator [of EPA] pursuant to this section as in effect before November 15, 1990 *shall remain in effect* as part of such applicable implementation plan, except to the extent that a revision to such provision is approved or promulgated by the Administrator pursuant to this chapter.

Section 110(n), 42 U.S.C. § 7410(n)(1) (emph. added).[5] This unconditional and sweeping savings clause—which saves "any provision" of "any SIP" until the SIP is formally revised—makes it "crystal clear" that Congress intended to hold agencies to their existing SIP obligations pending approval of new SIPs. *See* December 21, 1990 Order at 16–17 (savings clauses preserve conformity requirements in 1982 Plan). In other words, during this interim period precipitated by the 1990 amendments, Congress—perhaps anticipating the delays and vagaries inherent in the SIP revision process—chose to maintain the enforceability of approved SIPs unless and until they are formally replaced by a revised SIP.

■ Turning to the RFP provisions at issue here, we conclude, and MTC agreed at oral argument, that once a SIP translates the general RFP requirement into specific emission reduction and emissions level commitments, that such commitments become a "provision of the SIP." Indeed, as such commitments are integral, indispensable components of the SIP, they are clearly covered under the plain meaning of the term "any provision." [6] Accordingly, it

---

**4.** The specific provisions of the Clean Air Act at issue may not, in and of themselves be ambiguous. However, Congress' failure to address how the provisions interact with each other in connection with RFP obligations during this interim period has created ambiguity with respect to the issue raised by MTC's motion.

**5.** The other savings clause, found at 42 U.S.C. § 7515, provides in part that "[n]o control requirement in effect, or required to be adopted by an order ... or plan in effect before November 15, 1990.... may be modified after November 15, 1990 in any manner unless the modifica-

tion insures equivalent or greater emission reductions of such air pollutant." We need not address the applicability or effect of this savings clause as we believe the section 110(n) savings clause plainly covers RFP.

**6.** Indeed, whether or not RFP commitments are satisfied will determine whether other components of a SIP are activated. *See e.g.*, 42 U.S.C. § 7502(c)(9) (SIPs must provide for implementation of specific measures to be undertaken if the area fails to make reasonable further progress); 1982 Plan, Appendix H.

would appear that the section 110(n) savings clause saves RFP commitments in existing SIPs pending adoption and EPA approval of a new revised SIP.

This, however, does not end the matter. The RFP commitments in the 1982 Plan were designed with the then applicable 1987 statutory deadline in mind. Thus, for example, the 1982 Plan contains a visual RFP graph for hydrocarbons that begins in 1979 and ends in 1987. MTC contends that because the 1982 Plan did not project RFP beyond 1987, the RFP commitments in the Plan only "existed" through 1987, leaving the Bay Area without any enforceable or definable RFP commitments until Congress amended the Clean Air Act in 1990 to include new reduction schedules and attainment deadlines. Consequently, when Congress enacted the section 110(n) savings clause in 1990, there simply were no RFP commitments left to be saved. In other words, the savings clause is inapplicable because there are no RFP provisions to save.

We disagree that the RFP commitments in the 1982 Plan suddenly ceased to exist on January 1, 1988. Congress was clear that SIPs remain in force until a new SIP is approved regardless of whether the statutory deadline has passed. There is no basis or authority for singling out a central component of the SIP—the RFP commitments—and determining those provisions and commitments vanish simply because the statutory deadline passes. *Cf., CBE II,* 746 F.Supp. 976 (enforcing RFP commitments in 1982 Plan regarding hydrocarbons in 1990). Indeed, the 1982 Plan contains many provisions whereby certain events or commitments were to occur or be satisfied by certain dates. However, the fact that those dates passed without compliance, or that the 1987 statutory deadline expired, did not automatically parse those provisions from the 1982 Plan. On the contrary, to the extent such provisions concerned enforceable components, the courts have routinely enforced, and in fact are obliged

to enforce, such provision, despite the passage of governing deadlines. *See, American Lung Ass'n v. Kean,* 670 F.Supp. 1285, 1288–89 (D.N.J.), *aff'd,* 871 F.2d 319, 322 (3d Cir.1989); *NRDC v. New York,* 668 F.Supp. at 848, 852, 854. There is no basis for treating RFP commitments any differently. The RFP benchmarks in the 1982 Plan concern specific emission reductions and emission levels with respect to hydrocarbons and ozone. Indeed, as EPA's February 14, 1990 correspondence to MTC reflects, the commitment to achieve these specific emission levels and reductions can be enforced just as well now as it could in 1987 ("MTC's task is to develop and adopt TCMs that provide sufficient actual, enforceable emission reductions to eliminate the 1987 CO and HC [Hydrocarbon] shortfalls"). Plaintiff's Exh. G at 1.[7]

MTC also argues that, even assuming RFP commitments exist to be saved, we should nonetheless construe the section 110(n) savings clause to except RFP commitments. Otherwise, MTC argues, there will be a conflict between MTC's obligations to satisfy the RFP benchmarks in the 1982 Plan and its obligations to demonstrate that the reductions required by the 1990 amendments will be satisfied by 1995 and 1996. We can avoid such a conflict, MTC urges, if we simply view the RFP commitments in the 1982 Plan as ending in 1982 and the "new" reduction schedules set forth in the 1990 amendments as applying from now henceforth.

While this argument has superficial appeal, we conclude that MTC has set up a false conflict. If Congress intended to keep existing SIPS fully enforceable, absent substitution of a new SIP, there is no "conflict" in requiring MTC to abide by the 1982 Plan, including the RFP commitments contained therein, while the 1982 Plan undergoes the lengthy revision process, even though this may involve some additional obligation or effort on MTC's part.

Indeed, construing the savings clause to except RFP commitments from

---

7. The fact that the 1982 Plan does not expressly address RFP after 1987 is insignificant. The 1982 Plan presumed that NAAQS would be achieved by 1987; thus, there was no occasion to expressly extend RFP lines or benchmarks beyond that point.

its scope, as MTC urges, would create a gap in SIP enforceability that we do not believe Congress intended, and is contrary to the overall statutory scheme. As explained above, maintaining SIP enforceability pending the SIP revision process is a cornerstone of the statutory scheme. Yet MTC's approach arguably leaves states without RFP commitments during this lengthy interim period. Absent certain circumstances not relevant here, district courts are generally limited to enforcing provisions of an existing SIP. *Delaware Valley Citizens Council v. Davis*, 932 F.2d 256, 266 (3rd Cir.1991) (district court lacked subject matter jurisdiction over direct statutory violations asserted, where no violations of the SIP, itself, were involved); *CBE I*, 731 F.Supp. at 1454; *NRDC v. New York*, 668 F.Supp. at 854 (court has authority to enforce provisions of the SIP). Thus, there is no apparent basis for enforcing the new reduction schedules at this juncture, since they have yet to be incorporated into an approved SIP.[8]

█ To the extent that MTC is asking the Court to treat the 1982 Plan as having been *de facto* amended by the new reduction requirements contained in the 1990 amendments, we cannot accept this invitation, as SIP modification and revision can not be judicially effected. *See, Friends of the Earth*, 535 F.2d at 178–179 (Because SIP may only be modified pursuant to formal revision or postponement procedures, district court can not grant *de facto* revision of a SIP on other grounds).

Moreover, even assuming *arguendo* that the new reduction schedules are enforceable now, many technical questions may arise concerning their application in the Bay Area—questions which may well be resolved by EPA during the SIP revision

and approval process. Were we to *de facto* amend the RFP benchmarks now, before the new SIP is approved, the Court would be faced with the potentially difficult position of enforcing RFP benchmarks that have not yet been reviewed by EPA and incorporated into any approved SIP.[9] Given a choice, avoiding such a circumstance is preferable.

Finally, holding agencies to their existing RFP requirements is most consistent with the overall purpose of the Act, which is "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 7401. The Act's requirements with respect to SIPs emphasize that this purpose—healthy air—is to be attained "as expeditiously as practicable," but, in any event, *no later than* the attainment deadlines. 42 U.S.C. §§ 7502(a)(2)(A), 7512(a) (emph. added). Although MTC focuses on Congress' extension of the deadlines, the legislative history underscores that Congress regarded them as outside limits (indeed, the fact that States now face their third set of deadlines gives particular force to this sentiment):

> In the case of each individual nonattainment area, the bill continues the responsibility to attain as expeditiously as practicable. The objective is to achieve the standard as early as possible with effective and enforceable measures and without gaming by the States, industry, and others.

H.Rep. No. 490, Part 1, 101st Cong., 2d Sess. 223, 229 (1990).

If RFP commitments in existing SIPs require either the same or less action than would the new RFP schedules provided by the 1990 amendments, clearly there is no

---

8. We also note that this lack of enforceability would, in turn, render other critical portions of existing SIPs unenforceable pending SIP revision, such as contingency plans. Indeed, if the RFP commitments in the 1982 Plan are no longer enforceable because the 1987 deadline has passed, as MTC argues, then there is no basis for this Court to have enforced, in 1989, the 1982 Plan's contingency plans for the stationary source and transportation sectors—which were only triggered by the defendants' failure to dem-

onstrate RFP. Notably no defendant, including MTC, as ever intimated that the contingency plans were not enforceable on this ground.

9. These ultimate benchmarks will be affected by various factors including the appropriate design value, base year, emissions factors, and modelling assumptions, all of which will be the subject of EPA review during the SIP revision process.

"conflict" with the new deadlines. However, even if RFP commitments in existing SIPs would require some additional action beyond that which would be required to satisfy the new deadlines, this is not inconsistent with the statutory scheme since the new deadlines serve only as a floor. Should enforcement of RFP commitments in existing SIPs result in attainment earlier than 1995 or 1996, surely this would not be inconsistent with Congress' purpose of attaining the minimum federal standards as expeditiously as practicable.[10]

■ In sum, we conclude that Congress intended to hold agencies to RFP commitments contained in existing SIPs, pending formal SIP revision. Such an interpretation best reconciles and harmonizes the purposes of the Clean Air Act and the provisions of the 1990 Amendments. It is most consistent with the overall purpose of achieving healthy air as expeditiously as practicable and the statutory scheme of retaining the enforceability of existing SIPs until replaced; it also avoids a strained reading of the 1982 Plan's RFP provisions and the section 110(n) savings clause. Finally, it avoids creating a "conflict" between the savings clause and the new reduction requirements. *United States v. Stauffer Chemical Co.*, 684 F.2d 1174, 1184 (6th Cir.1982) ("A statute should be read and construed as a whole, and, if possible, given a harmonious, comprehensive meaning"). Nor is such an interpretation inconsistent with the new deadlines, given Congress' intent that compliance with federal air quality standards be achieved as expeditiously as practicable. 42 U.S.C. § 7502(a)(2)(A).

Accordingly, and for all the reasons set forth above, we conclude that the RFP commitments contained in the 1982 Plan remain in force until the 1982 Plan is replaced by a new EPA approved plan. Consequently, until such time as the EPA Administrator approves a revision to the 1982 Plan containing new RFP commitments, RFP for purposes of MTC's obligations under the 1982 Plan's transportation contingency plan, shall continue to be measured by reference to the 1982 Plan. MTC's counter-motion for summary judgment is therefore denied. Plaintiffs have also requested that a partial summary judgment on this issue be entered in its favor. As the issues raised by this motion are purely legal in nature, the Court finds such request appropriate and thus also grants a partial summary judgment in plaintiffs' favor with respect to the legal conclusions set forth above.

II.

*Plaintiffs' Motion for Contempt and/or Summary Judgment Regarding Transportation Control Measures*

Plaintiffs contend that MTC has not adopted sufficient TCMs to bring the region back on the RFP line, as required by this Court's September 19, 1989 Order. Accordingly, they seek either a finding of contempt or a summary judgment that MTC is in continuing violation of the transportation contingency plan. We review these contentions in light of the RFP commitments set forth in the 1982 Plan.

A. *Contempt*

■ Civil contempt may be found when a party fails to comply with a court

---

**10.** MTC emphasizes that it is not, by this motion, attempting to avoid any obligations under the 1982 Plan, since it believes that RFP has been demonstrated, whether it is measured by the 1982 Plan or the 1990 amendments. It also asserts that the new RFP lines that will be contained in the revised SIPs will produce more progress than the now "static" RFP line in the 1982 Plan. Therefore, it is MTC that is actually on the side of "progress," and plaintiffs that are the impediments. These declarations of intention, however, miss the point. Whether one RFP standard would, in practice, require more progress than the other at this particular juncture, is irrelevant to the purely legal issue whether Congress, pursuant to the section 110(n) savings clause, preserved RFP commitments in existing SIPs pending approval of replacement SIPs. Moreover, we note this is not a question of preferring a "static" RFP line to a downward sloping RFP line. Rather, as noted at page 1295, *supra*, it is a question of whether the RFP benchmarks for 1987 can be enforced at the same time that agencies work toward satisfying the new reduction schedules.

order that is both specific and definite. 18 U.S.C. § 401; *Balla v. Idaho State Bd of Corrections*, 869 F.2d 461, 465 (9th Cir. 1989). It is the movant's burden to prove a violation of the court's order by clear and convincing evidence. *KSM Fastening Systems v. H.A. Jones Co.*, 776 F.2d 1522, 1524 (Fed.Cir.1985); 11 Wright & Miller, *Federal Practice & Procedure*, § 2960. However, it is not necessary to find that a party willfully or intentionally failed to comply, and "good faith" is not a defense. Rather, the only issue is whether the party could have complied (or took all reasonable steps within its power to comply). *Peppers v. Barry*, 873 F.2d 967, 968–969 (6th Cir. 1989); *Perry v. O'Donnell*, 759 F.2d 702, 705 (9th Cir.1985); *Donovan v. Mazzola*, 716 F.2d 1226, 1240 (9th Cir.1983).

■ As noted, the September 19, 1989 Order required MTC to adopt sufficient additional TCMs to "bring the region back on the RFP line." This language, taken from the 1982 Plan, was not defined with respect to either ozone or carbon monoxide. Plaintiffs contend one need only look to other provisions in the 1982 Plan to elucidate the meaning of the phrase. However, that there are different ways to interpret the 1982 Plan in this regard is evidenced by *CBE II* (decided well after the 2131 TCMs were adopted), as well as the briefs filed in support of the instant motion. Thus, even assuming *arguendo* that plaintiffs could show a violation of the September 19th Order by clear and convincing evidence, the September 19, 1989 Order was not sufficiently definite, with respect to MTC's obligation to adopt sufficient additional TCMs to bring the region back on the RFP line, to warrant a finding of contempt under the circumstances presented here.[11]

B. *Summary Judgment*

To obtain a summary judgment, plaintiffs must demonstrate that there are no genuine disputes of fact, and that they are entitled to judgment as a matter of law. Fed.R.Civ.P. 56. Accordingly, if the record demonstrates the absence of any genuine dispute that the 16 additional TCMs MTC adopted in Resolution 2131 are insufficient to put the region back on the RFP line, with respect to either ozone or carbon monoxide, MTC will remain in violation of the contingency plan for transportation sector as a matter of law. *See CBE I*, 731 F.Supp. at 1458. Unfortunately, there have not been any official RFP reports since 1987; thus, the parties and the Court have had to turn to other sources to evaluate the extent to which RFP has been made with respect to ozone and carbon monoxide. We discuss each of these pollutants in turn.

### 1. Ozone

(a) *RFP Benchmarks under the 1982 Plan for Ozone*

■ The 1982 Plan's initial strategy for achieving NAAQS for ozone was to reduce hydrocarbon emissions from stationary sources (e.g. factories and household products) and from vehicles through the Inspection and Maintenance Program ("I & M Program"), commonly known as the "smog check program." TCMs contribute relatively little to ozone reduction (the original ten TCMs in the 1982 Plan contributed a 1.8 tpd hydrocarbon emission reduction). 1987 RFP Report. Thus, the 1982 Plan did not even consider hydrocarbon emission reductions from TCMs in making its attainment demonstration.[12]

In *CBE II* (enforcing the contingency plan for stationary sources), we held that the 1982 Plan measured RFP for ozone by two different benchmarks: (a) the residual "emissions levels" and (b) the "emission reductions." The former denotes the level of hydrocarbons in the air, while the latter

---

**11.** The August 28, 1990 Order was not directed toward MTC and plaintiffs have not sought contempt on the basis of that Order. We also note, of course, that had MTC taken no steps to comply with the September 19, 1991 Order we would be facing a different situation altogether. However, where the issue of compliance turns on the exact definition of RFP, we do not be-

lieve that contempt procedures are appropriate for the reasons stated above.

**12.** *See also,* 1982 Plan at 102 ("TCMs reduce hydrocarbons and oxides of nitrogen simultaneously, and so have virtually no impact on ozone levels").

concerns the amount of reductions in hydrocarbon emissions that are achieved from various control measures that are adopted. The 1982 Plan committed to achieving an hydrocarbon emissions level of 430 tpd and reductions totalling 85 tpd by 1987. Thus, RFP, as defined by the 1982 Plan, is satisfied at this post–1987 juncture, if defendants have satisfied both the 430 tpd hydrocarbon emissions level commitment and the 85 tpd emission reduction commitment. *CBE II* at 982–984 ("[T]he 1982 Plan measures RFP by both the emissions level and the target reductions, as the two figures are essentially two sides of the same coin").

(b) *Achievement of RFP for ozone under the 1982 Plan*

In *CBE II*, decided in August 1990, we held that the ARB and the Bay Area Air Quality Management District ("District") were liable for not implementing the contingency plan for stationary sources with respect to ozone because the RFP commitments described above for ozone had not been satisfied. In reaching this conclusion, we relied on the District's own figures (as set forth in Edward Miller's Decl., Exh. F), which showed that by year end 1989, hydrocarbon emission reductions were only 70.6 tpd (14.4. tpd short of the 85 tpd commitment) and that emission levels were 451.4 tpd (21 tpd over the 430 tpd commitment). *CBE II*, 746 F.Supp. at 981.

Plaintiffs again point to these figures and argue that the 3.83 tpd reduction in hydrocarbons expected from the 2131 TCMs do not make up the 14.4 tpd shortfall; therefore, MTC has not complied with its obligation to adopt sufficient additional TCMs to make up the RFP shortfall for ozone.

It is true that the District's projections (as set forth by Miller's Decl., Exh. F), showed the above shortfalls in 1989; however, plaintiffs' reliance on the 1989 estimates (which were relevant to deciding

*CBE II* in 1990), is misplaced. Indeed, plaintiffs inexplicably ignore that Miller's projections also showed that these shortfalls would be cured by year end 1991, based on estimated emission reductions from the I & M Program and various stationary sources.[13]

Plaintiffs' main argument, however, is that recent data compiled by MTC and other agencies (referred to as the "updated data"), demonstrates that the Bay Area is substantially out of compliance with the hydrocarbon emission levels committed to in the 1982 Plan—at least with respect to the transportation sector. In particular, plaintiffs point to MTC's 1991 estimated inventory for mobile sources for regional hydrocarbons, which is 199 tpd, and thus well over the 143 tpd the 1982 Plan committed to achieve, with respect to the transportation sector, by 1987. *See* Sierra Club's Reply, at 20, Table 1; MTC's Memorandum in Support of Revised Conformity Assessment Procedures (filed 7/3/90) at 5, n 5. Nor is the difference cured by the 4.46 tpd reduction expected from the 2131 TCMs. *Id.*

It is true that the updated data from the 1987 inventories indicates a higher emissions level than those committed to by the 1982 Plan. However, the updated data rests on a different set of assumptions and different methodology than that which was used to develop the RFP line in the 1982 Plan. Thus, as explained below, we agree with MTC that comparing the 1982 Plan RFP requirements to the updated data would improperly "mix apples with oranges."

The 1982 Plan committed to a 430 tpd emissions level for hydrocarbons based on 1979 inventory data, whereas the new data which will be used to develop the revised SIP will be based on 1987 inventory data. The 1979 and 1987 inventories are based on different types and categories of ROG (reactive organic gases) sources, and the methodologies use to calculate ROG emis-

---

**13.** Miller's Decl., Exh. F. indicates that in 1990, hydrocarbon emission levels would be 529 tpd by the end of 1991, which would be *99* (rather than 85) tpd over the required 430 tpd emissions level. However, the District also projected that

emissions reductions of *99.1* tpd would be achieved by year end 1991, and therefore the 430 tpd emissions level could be achieved by year end 1991 (30.5 tpd from the I & M Program and 68.6 tpd from stationary source measures).

sions from specific types of sources vary. For example, the 1987 inventory will include data on various source categories that were not included in the 1979 inventory; also the travel models utilized have changed. *See* Miller Decl., ¶ 13, Purvis July 22, 1991 Decl., at ¶ 11; MTC's July 22, 1991 Suppl. Brief at 12–13.

Moreover, the 430 tpd limit only has relevance in relation to the 1982 Plan's projection (based on the 1979 inventory data and models and assumptions in use at the time), that hydrocarbon levels would be 515 tpd in 1987 absent 1982 Plan controls. This is because the 1982 Plan arrived at the 430 tpd figure by determining the percentage reduction in emissions necessary to achieve NAAQS for ozone, based on the design value for the Bay Area, and then subtracting this percentage from the projected 515 tpd "uncontrolled" [14] emissions level. Harvey Decl. at ¶ 37. Thus, the 430 tpd emissions level only has meaning insofar as the critical assumption—that uncontrolled levels would be 515 tpd—remains constant. As such, it would be inappropriate to compare the RFP benchmarks generated by the 1982 Plan on a ton for ton basis to the projections generated by the 1987 inventory data, since that data will provide an entirely new set of projections concerning pre-control levels. For example, the new data could indicate that pre-control levels are 1000 tpd; however, if the design value indicates that the Bay Area exceeds NAAQS for ozone by 15%, then the relevant RFP benchmark would be 850 tpd, not 430 tpd.

Accordingly, we conclude that plaintiffs can not demonstrate liability by reliance on the updated data which is based on new assumptions, models and inventories. Rather, if we are to measure RFP by the terms of the 1982 Plan, we must also stay true to the assumptions and methodology of the 1982 Plan in order to preserve inter-

nal consistency. *CBE II*, 746 F.Supp at 982. We agree with MTC that the approach taken in Miller's Decl., Exh. F, reflects an analysis most consistent with the assumptions and methodology of the 1982 Plan, particularly in that it continues the 1982 Plan's assumptions regarding uncontrolled emissions.[15]

As MTC points out, Miller's Exh. F indicates that RFP for ozone will be achieved by year end 1991, even without reliance on *any* hydrocarbon reductions from contingency TCMs. Specifically, Exh. F projects that by year end 1991, hydrocarbon emission levels would be 529 tpd by the end of 1991 (99 tpd over the 430 tpd emissions level), but that hydrocarbon emission reductions of 99.1 tpd would be achieved by year end 1991, resulting in an emissions level of 429.9 tpd.

However, Miller assumed that hydrocarbon emission reductions from the I & M Program would be 30.5 tpd in 1991. As discussed in more detail *infra*, this figure no longer warrants reliance in light of the findings of a more recent 1991 study (not available at the time Miller prepared his June 25, 1990 declaration), which indicates that the I & M Program will only achieve approximately 18 percent hydrocarbon reductions by 1992, instead of the formerly anticipated 25 percent. *See* this Order at 32–36, and Appendix A to MTC's July 22, 1991 Supplemental Brief at 1, 57, Fig. V–2.

Although the new study raises questions regarding whether RFP has been made for ozone, the record does not demonstrate that RFP has not been made. The majority of the hydrocarbon emission reductions stem from stationary source control measures. However, Miller's Decl., Exh. F, which projects 63.9 tpd reductions from varying stationary source control measures for 1991, is over one year old, and neither the ARB nor the District are before the

---

**14.** By the term "uncontrolled," the Court is referring to emissions levels absent 1982 Plan controls.

**15.** We also take this opportunity to note that utilization of Miller's approach does not render the 430 tpd emissions level requirement irrelevant. If the 430 tpd level were not a component

of the RFP requirement, RFP for ozone would be satisfied solely based on a showing of 85 tpd in reductions. However, by enforcing the 430 tpd emissions level, defendants are required to demonstrate a 99.1 tpd reduction in order to satisfy the emission level component of RFP.

Court to update those figures. For example, Exh. F indicates that reductions from aerosol paint control measures may be greater than stated if a total ban is imposed, noting that a hearing was set for June 20, 1990. Thus, the current record is inadequate to demonstrate that RFP has not been satisfied for ozone.[16]

### 2. Carbon Monoxide

■ The 1982 Plan's strategy for attaining NAAQS for carbon monoxide was to achieve CO reductions through the I & M "smog check" Program and the ten original TCMs set forth in the 1982 Plan. 1982 Plan at 94, B–1.[17] The 1982 Plan does not, however, contain any neatly defined RFP graph for CO, as it does for ozone. Plaintiffs contend, however, that taken together, the provisions of the 1982 Plan prescribe three separate RFP lines for CO: (1) a regional RFP CO line, (2) a "surrogate" regional RFP line based on VT and VMT (Vehicle Trips and Vehicle Miles per Trip), and (3) subregional RFP CO lines for downtown San Jose and San Jose hot spots. Each is discussed in turn.

#### (a) *RFP Benchmarks under the 1982 Plan for CO*

#### (i) Regional CO RFP line

The 1982 Plan projected that CO emissions in 1987 for the Bay Area would be 2340 tpd "before controls" (i.e. before the I & M Program and the 10 TCMs), with 1934 tpd of that total coming from the transportation sector (all on-road vehicles).[18] 1982 Plan, E–4–6, and B–1. The I & M Program was projected to reduce CO emissions by 25 percent or 367 tpd, and the ten TCMs 26 tpd, for a total reduction of 393 tpd. *Id.* and 1982 Plan at 94, 127. Subtracting the 393 tpd in anticipated reductions from the "before control" emissions levels leaves a

residual CO emissions level of 1947 tpd overall, and 1541 tpd for the transportation sector (on-road vehicles).

Viewed together, the above data describes a regional RFP line for CO for the transportation sector which descends from a 1934 tpd CO emissions level in 1979 to a 1541 tpd CO emissions level in 1987. Thus, plaintiffs argue, "regional RFP" for CO would be satisfied, under the 1982 Plan, if there is a transportation sector CO emissions level of 1541 tpd and a reduction in CO emissions of 393 tpd.

MTC does not argue with these figures, but instead posits that the 1982 Plan contains no "regional" RFP line at all given the absence of any regional RFP "graph," such as the one included for ozone. MTC also emphasizes that the 1982 Plan focused on control strategies for San Jose, where CO pollution is the worst. *See* 1988 RFP Retrospective, Pl's Exh. E at 199.

Neither of these points persuade us that the 1982 Plan only committed to making RFP for CO in San Jose and not on a regional level. Rather, the numerous provisions and data in the 1982 Plan pertaining to regional CO (including the I & M Program which operates on a region wide basis), makes it clear that the Plan viewed regional CO levels as a component of the RFP equation for carbon monoxide.

MTC concedes that the 1982 Plan "contains numerous references to regional CO inventories" and that past RFP reports discuss the estimated regional CO reductions, but dismisses these references as simply background data for assessing "regional trends." *Id.* at 23. We reject this interpretation, particularly given that MTC, itself, previously stated that the 1982 Plan provided a regional emissions level associated

---

16. We also note that, since achieving the 430 tpd emissions level is a "joint obligation" of MTC, the District, and the ARB, it is difficult to resolve RFP issues without the participation of the ARB and the District as well.

17. The ten original TCMs mostly concern reaffirming support for existing programs, i.e. TCM # 5 is described as "Continue to support RIDES

efforts" and TCM # 6 is described as "Continue efforts to obtain funding to support long-range transit improvements." 1982 Plan, B–6–7.

18. The remaining 406 tpd is attributed primarily to off-road vehicles, pleasures boats, lawnmowers and other gasoline engines. 1982 Plan, E–4–6.

with attainment.[19] We also note that a letter from EPA supports plaintiffs' view that the 1982 Plan contemplated a regional CO RFP line:

> The TCMS adopted in the contingency plan need not bring the area into attainment of the Ozone and CO NAAQS, but only reduce emissions in the transportation sector to the levels projected in the 1982 Plan. These include *not only regional HC and CO levels,* but also Hot Spot and Areawide CO emissions for the San Jose area.

Pl's Exh. G at 271 (emph. added).

### (ii) VT and VMT surrogate regional RFP line

The second RFP benchmark plaintiffs claim the 1982 Plan imposes is a "surrogate" for CO emissions. Because carbon monoxide emissions are less amenable to direct measurement than are hydrocarbons,[20] the 1982 Plan discusses statistics regarding "Vehicle Miles of Travel" ("VMT") and "Vehicle Trips" per day ("VT") as proxies, and discusses limits on VMT and VT. *See* 1982 Plan at 149, Fig. 22–23, and at 57, Table 4. However, we decline to construe the 1982 Plan as requiring that RFP for CO be determined by reference to VMT or VT standards. In both the 1977 and 1990 amendments, Congress defined RFP in terms of reductions in emissions, not VT and VMT. Nor has EPA ever suggested that VT and VMT constitute enforceable standards for CO RFP.

### (iii) Sub-regional RFP CO benchmarks for downtown San Jose and San Jose hot spot

The third RFP benchmark plaintiffs seek to impose is the emission levels and reductions set forth for the 25 square kilometer area surrounding downtown San Jose

(where the worst CO pollution is located) and a San Jose hot spot at First and Santa Clara. MTC does not dispute that the 1982 Plan measures RFP for CO by reference to the benchmarks for San Jose.

### (b) *Achievement of RFP for CO*

#### (i) Regional RFP

As noted, the 1982 Plan estimated that the I & M Program would reduce CO emissions by 25 percent or 367 tpd, and the original ten TCMs by 26 tpd, for a total reduction of 393 tpd. According to the most recent (1987) RFP Report, the original ten TCMs resulted in 16–20 of the expected 26 tpd reductions through 1987. Bay Area Air Quality 1987 RFP Report (November 1988), at 40, Plaintiffs' Exh. D ("1987 RFP Report").

However, the primary reason that neither RFP nor NAAQS was met for carbon monoxide in 1987 was the disappointing results of the I & M Program. "The major reason that mobile source emissions failed to meet the requirements of the 1982 Air Quality Plan was lower than expected results of the [I & M Program]." Feb. 16, 1991 Memorandum from MTC's Executive Director to the Work Plan and Revision Committee at 2, Pls' Exh. DD at 000784. Specifically, the I & M Program only produced 9.8% reductions with respect to carbon monoxide emissions, instead of the anticipated 25%, thus creating an over 200 tpd shortfall. *Id.;* February 9, 1989 letter from ARB, Pls' Exh. 7 at 000647.[21]

In response, the State legislature strengthened the I & M Program in 1989, through enactment of SB 1997, which became effective in 1990. In its May 1989 Report to the State legislature, the ARB projected that these improvements would yield 26.9% reductions for CO by "the 1990s." Appendix A to MTC's July 22,

---

**19.** *See* MTC's Memorandum in Support of Revised Conformity Assessment Procedures at 6, n. 5 (filed July 3, 1990).

**20.** *See* 1988 RFP Retrospective, Pl's Exh. E at 202 ("Accurately assessing reasonable further progress is difficult because of the many factors and uncertainties which influence the variations and measurements of CO emissions and air quality.... ¶ [W]ide fluctuations ... may ap-

pear in any given year largely due to meteorological influences").

**21.** *See also,* Bay Area Quality RFP Reports: A Retrospective Assessment of 1985 and 1986 (1988) (prepared by Association of Bay Area Governments) at 000218 (out of order in exhibit) (I & M Program in 1986 reduced emissions by 144 tpd).

1991 Supplemental Brief, at 7, Fig. 1. Interpolating these figures for the intervening years indicates a 23.8 percentage effectiveness for 1991, which translates into a 349 tpd reduction. MTC's Suppl. Brief, filed July 22, 1991 at 22, n. 12. However, the ARB acknowledged that it considered these estimates "to be optimistic" because achieving the reductions would require "substantial improvements in mechanics' ability to detect and properly correct emission related problems." Pls' Exh. Y at 000647.

ARB subsequently commissioned a more recent study entitled Development of the CALIMFAC California I/M Benefits Model (January 1991). Appendix B to MTC's July 22, 1991 Supplemental Brief (hereafter "1991 CALIMFAC report").[22] CALIMFAC models the effectiveness of the I & M Program by calculating exhaust emissions factors with and without the I & M Program. *Id.* It concludes that once the program enhancements mandated by SB 1997 are fully implemented in 1992, CO emissions will be reduced 19%. Giving MTC the benefit of this extra year, this translates into a 278.9 tpd reduction.[23] Once the original TCMs (16–20 tpd), and the contingency 2131 TCMs (74.1 tpd) are accounted for, there is still a shortfall of between 20 to 24 tpd; this shortfall increases when one considers that three of the contingency 2131 TCMs have apparently stalled for lack of funding or authority, which reduces projected reductions from these measures to 41.8 instead of 74.1 tpd,[24] resulting in shortfalls of 52.3 to 56.3 tpd.[25]

As MTC points out, it has not relied on the 1991 CALIMFAC report, and it does not constitute an official report to the legislature from the ARB. However, MTC's lack of reliance is immaterial as liability in a SIP enforcement action turns solely on actual compliance, not good faith efforts or intentions. *CBE I* at 1458. The fact that the 1991 CALIMFAC report is not an official report to the legislature is a factor for the Court to consider in determining the weight that the report deserves. However, the Court is not persuaded that this factor warrants ignoring the report. Rather, based on the record before us, we are satisfied that the report has significant evidentiary value. Not only does it constitute the most recent study of the I & M Program, but it utilizes a model, which while not perfect, represents the best available tool for I & M forecasting. Further, assumptions about the effectiveness of the I & M Program, based on the 1991 CALIMFAC report, have been modeled and incorporated by the ARB into CALIMFAC, as well as EMFAC 7E, the emission factors model developed by the ARB. Susnowitz Decl., and testimony via August 13, 1991 telephone conference.[26]

The Court acknowledges that the 1991 CALIMFAC report represents projections based on a model; however, the nature of transportation planning necessarily requires reliance, at least to some degree, on modelled projections. Further, according to Susnowitz, the ARB will not report to the State legislature regarding its studies

---

**22.** CALIMFAC is short for CALifornia I/M FACtor. Although dated January 1991, work on the study was completed as of April 1990. *Id.* at 1 and inside face page.

**23.** Reductions of 19% instead of 25% constitutes a 76% effectiveness rate. Seventy six percent of 367 tpd is 278 tpd.

**24.** Specifically, stalled TCMs #s 14, 23, and 24 were forecast to produce 2.6, 2.9, and 26.5 tpd respectively. MTC's Oppo at 33, n. 20; Pls' Reply at 24, n. 33.; Pls' Exh. A at 32, 34–36; Brittle Decl., and Exh. E. *See* Suppl. Harvey Decl. at ¶ 10, and Exh. E for revised estimates utilizing EMFAC 7E.

**25.** Even assuming that the 393 tpd figure should be reduced to 351.3 tpd to account for the 1982

Plan's assumption that uncontrolled vehicular CO emissions would decline from 1934 tpd in 1987 to 1892.3 tpd in 1990 (i.e. at an annual reduction rate of 13.9 tpd), a 10.6–14.6 tpd shortfall exists (351.3 tpd less 278.9 tpd (I & M)), less 16–20 tpd (original TCMs), less 41.8 tpd (2131 TCMs).

**26.** The telephone conference was conducted by the Court for purposes of clarifying portions of Mr. Susnowitz' declaration. Counsel for MTC, the ARB, and plaintiffs participated and were given opportunity to question Mr. Susnowitz as well. The neutral expert, Martin Wachs, was unable to participate due to a scheduling conflict.

of the enhanced I & M Program based on actual data until 1995.[27]

Given all of the above, we are satisfied that the 1991 CALIMFAC report represents the most recent, reliable information regarding the effectiveness of the I & M Program. Accordingly, we find that the effectiveness of the I & M Program should be measured with the 1991 CALIMFAC report in mind. As such, the record demonstrates that while the Bay Area has progressed since 1987, RFP with respect to carbon monoxide, as measured in terms of the 1982 Plan, has not yet been made, notwithstanding the adoption of the contingency 2131 TCMs.[28]

(ii) 1541 tpd regional CO emissions level

As discussed earlier, the 1982 Plan set the desired regional emissions level for CO at 1541 tpd for the transportation sectors. Plaintiffs argue that the 1541 tpd standard is not satisfied because MTC's projections based on the 1987 inventory data, and updated models show that the estimated inventory for mobile sources for 1991 is 1623 tons per day (resulting in an 82 tpd shortfall), and the 16 additional TCMs MTC adopted only make up a portion of the difference. *See* Sierra Club's Reply at 20, Table 1. As explained above, however, we conclude that this is not an appropriate manner of establishing liability.

On the other hand, an analysis based on the assumptions of the 1982 Plan does yield a shortfall. The 1982 Plan assumes that the carbon monoxide emissions level would be 1892.3 tpd in 1990. We credit the I & M Program with 278.9 tpd. Adding an additional 16–20 tpd for the original TCMs and 41.8 tpd for the 2131 TCMs, leaves a shortfall of 10.6 to 14.6 tpd.12

(c) *Sub-regional RFP*

(i) Downtown San Jose Area

Here, the updated data indicates emissions levels lower than the RFP benchmarks set out in the 1982 Plan. However, plaintiffs contend that these projections are significantly understated because of a flawed application of the EMFAC 7E factors. We need not resolve this dispute, however, given our determination that it is inappropriate to compare the updated data (even were it corrected to satisfy plaintiffs' objections) to the RFP benchmarks in the 1982 Plan.

Nor does adhering to the assumptions of the 1982 Plan demonstrate that RFP has not been met. The 1982 Plan assumes that by 1990—three years after the 1987 deadline—CO levels would have fallen sufficiently to satisfy the 1987 RFP benchmark of 108,000 gm/pk hr/km. 1982 Plan at 138; Harvey Decl. at ¶ 36. Accordingly, the record does not demonstrate that RFP has not been made for downtown San Jose specifically.

(ii) San Jose Hot Spots

According to the assumptions of the 1982 Plan, controls were necessary to achieve RFP by 1987 for carbon monoxide at the hot spot of First Street and Santa Clara Avenue in San Jose by 1991. Again, however, based on the assumptions of the 1982 Plan, RFP would be achieved for this hot spot, even without the 1982 Plan controls—albeit three years later—in 1990. 1982 Plan at 138, Table 31; MTC's Opposition at 31, n. 17. Accordingly, we conclude that plaintiffs have not established liability with respect to the hot spot.[29]

---

27. An interim 1991 report to the Legislature is still in draft form. However, it is not anticipated to include representations concerning specific emission reductions. Susnowitz testimony.

28. Needless to say, there is a clear analytical distinction between applying updated models, inventories, and assumptions to directly determine whether RFP emissions level benchmarks have been satisfied, and using the most recent data to determine the reductions attributable to a particular control measure.

29. Plaintiffs also argue that the 1982 Plan developed hot spot inventories for 45 other San Jose intersection; however, because these inventories are contained only in a Technical Memo (No. 46, Table 8), and the 1982 Plan nowhere suggests that RFP be evaluated by reference to enforceable emissions levels at these other intersections, we conclude that the 1982 Plan does not contain enforceable RFP benchmarks for these other intersections.

### 3. Liability

As of 1987, the last official RFP report, the Bay Area was not on the RFP line for either ozone or CO. 1987 RFP Report at 59, Plaintiffs' Exh. D. Although it is now four years, later, the Court unfortunately does not have the benefit of any recent RFP reports to provide guidance; nor has EPA made any determinations regarding current compliance with RFP. Under these circumstances, and for purposes of internal consistency, the Court concludes it is appropriate to analyze RFP in a manner consistent with the methodology and assumptions utilized in the 1982 Plan. Under this framework, and given the data available, the Court concludes that, for the purposes of the transportation contingency plan, plaintiffs have not demonstrated that the 2131 TCMs do not satisfy MTC's obligations with respect to ozone. However, the 2131 TCMs do not satisfy MTC's obligations with respect to carbon monoxide, inasmuch as the record establishes that MTC has not satisfied the Reasonable Further Progress benchmark for carbon monoxide emission reductions or emission levels for the transportation sector, as set forth in the 1982 Plan.

As noted above, "liability in a citizen's enforcement action turns solely on the question of actual compliance. States have an unwavering obligation to carry out federally mandated SIPs; thus, where a SIP is violated, liability attaches, regardless of the reasons for the violation." *CBE I* at 1458 (and cases cited therein).

Because the record demonstrates that MTC has not made RFP for carbon monoxide as defined by the 1982 Plan, taking into account the contingency 2131 TCMs, MTC is not yet in full compliance with the transportation contingency plan's requirement that it adopt sufficient additional TCMs to bring the region back within the RFP line. As such, plaintiffs are entitled to a partial summary judgment that MTC is not in compliance with the contingency transportation plan with respect to carbon monoxide.

### 4. Remedy

As explained in our December 21, 1990 Order at 24–25, upon a showing of a SIP violation, the Court has an obligation to enforce the SIP—in this case, the transportation contingency plan with respect to carbon monoxide, *NRDC v. New York State*, 668 F.Supp. at 854; however, the appropriate manner of enforcement is left to the discretion of the district court. *American Lung Ass'n*, 871 F.2d at 327 ("district court's remedial order for SIP violation 'is an equitable order, made within the ambit of the district court's discretion to fashion appropriate remedies'"); *Friends of the Earth v. Carey*, 535 F.2d at 173 (courts are "obligated, upon a showing that the state has violated the plan, to issue appropriate orders for its enforcement").

As we are persuaded that the contingency 2131 TCMs adopted by MTC, while providing significant progress, are not sufficient to put the Bay Area back on the RFP line, as defined in the 1982 Plan for carbon monoxide, a remedy is appropriate. However, models and projections are by their nature inexact, and we are not convinced that it is appropriate or necessary at this juncture to impose a precise "ton per day" reduction requirement.

In the process of adopting the 2131 TCMs, MTC developed a comprehensive list of potential TCMs that includes dozens of possibilities. Brittle Decl. at ¶ 5, and Exh. A. While MTC refined this list down to sixteen TCMs, *id.* at ¶ 7, and implicitly argues that no other TCMs are possible, the record does not persuade us that adoption of additional TCMs would not be feasible. Satisfaction of this Court's September 19, 1989 remedial order—that MTC fully implement the transportation contingency plan—rests with MTC. We therefore place the burden on MTC to either identify additional feasible TCMs (including authorized or funded "stalled" 2131 TCMs) or demonstrate why such additional TCMs are infeasible. No Court, of course, will require impracticable measures or measures that cause a substantially disproportionate hardship for the air quality benefits accrued, regardless of the ton per day shortfall. On the other hand, infeasibility means more than inconvenience, unpopularity, or mod-

erate burdens. We choose this pragmatic approach believing that it is in keeping with both the spirit of the Clean Air Act and the constraints imposed by practical realities.

## III.

### *Order*

Accordingly, and good cause appearing, it is HEREBY ORDERED that:

1. MTC's cross-motion for partial summary judgment is DENIED. The Court enters a partial summary judgment, in plaintiffs' favor, that, for purposes of determining satisfaction of obligations under the 1982 Plan, RFP is determined by reference to the 1982 Plan until the 1982 Plan is revised or modified pursuant to the Clean Air Act.

2. Plaintiffs' motion for contempt is denied.

3. Plaintiffs' alternative motion for partial summary judgment is granted in part and denied in part as set forth above.

4. MTC remains liable with respect to implementation of the transportation contingency plan for carbon monoxide. However, the Court defers ordering adoption of any additional TCMs pending MTC's demonstration, within 120 days of the date of this Order, as to the feasibility or infeasibility of additional TCMs. To the extent that modeling is utilized to evaluate effectiveness of TCMs such models shall incorporate the effectiveness percentages for the enhanced I & M Program, where appropriate, that are set forth in the 1991 CALIM-FAC report.[30] Plaintiffs shall have 30 days from service of MTC's demonstration to file any objections thereto. MTC shall have 14 days from service of plaintiffs' objections to file any response thereto. The matter will then be submitted on the

papers, unless otherwise ordered by the Court.

---

**30.** The parties dispute whether MTC should be able to claim credit now for an oxygenated fuels program required by the 1990 amendments to the Clean Air Act. The oxygenated fuels program is not required to be implemented until November 1992, and could be subject to additional extensions. 42 U.S.C. § 7545(m)(2) and (3)(C). The parties may address this issue further in the context of MTC's demonstration required by this paragraph.